Flaherty *v.* Allegheny Port Authority et al., Appellants.

510

Argued November 29, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*David W. Craig,* with him *Robert N. Hackett,* and *Baskin, Boreman, Wilner, Sachs, Gondelman & Craig,* for Allegheny Port Authority, appellant.

*John J. Hickton,* Deputy Solicitor, with him *Francis A. Barry,* County Solicitor, for Board of County Commissioners of Allegheny County, appellants.

*Albert D. Brandon,* with him *Eugene B. Strassburger, III, Daniel M. Curtin,* Assistant City Solicitor, and *Ralph Lynch, Jr.,* City Solicitor, for appellees.

*Harold R. Schmidt* and *Edward C. Schmidt,* with them *Roger Curran,* and *Rose, Schmidt and Dixon,* for amicus curiae.

OPINION BY MR. CHIEF JUSTICE JONES, January 19, 1973:

Plaintiffs, individually and as mayors of thirteen metropolitan Pittsburgh municipalities,[1] filed this action in equity seeking a preliminary injunction against construction of the rapid mass transit project known as the "Early Action Program" ("Early Action"). The preliminary injunction hearing commenced on January 19, 1972, before the Honorable Anne X. ALPERN and, after sixty-nine days of hearings lasting until May 8, 1972, Judge ALPERN issued a preliminary injunction. A final hearing was conducted on September 11-15, 1972, and a decree nisi granting the injunction was entered November 6, 1972. Defendant Port Authority of Allegheny County ("Authority") and the Board of County Commissioners of Allegheny County ("Commissioners") petitioned this Court for the assumption of plenary jurisdiction under Section 205 of the Appellate Court Jurisdiction Act, Act of July 31, 1970, P. L. 673, 17 P.S. §211.205. The petition for plenary jurisdiction was granted per curiam on November 15, 1972.

Early Action is a multifarious mass transit system involving: (1) a Transit Expressway line from downtown Pittsburgh to South Hills Village, 10.6 miles in length; (2) an exclusive grade-separated bus highway called the "South PATway" which is four miles long and which bypasses the Liberty Tubes; (3) an eight-mile exclusive, grade-separated bus highway called the "East PATway" which bypassess the Squirel Hill Tunnels and the Penn-Lincoln Parkway; and (4) the renovation of the Library trolley line.

The rapid transit prototype ((1) *supra*) is called "Skybus".[2] It was designed and engineered by the

---

[1] Dr. William Hunt, minority Commissioner of the Allegheny County Board of County Commissioners, is also named as plaintiff.

[2] The Skybus prototype is an innovative rubber-tired vehicle operating electrically on a fixed guiderail without attendant. It

Westinghouse Electric Corporation and will be installed as the Transit Expressway vehicle if its prototype meets with performance specifications being prepared by Kaiser Engineers.

Early Action had its genesis in a June 1, 1961, study of mass transit prepared by the engineering firm of Coverdale and Colpitts under direction of the Port Authority.[3] The study recommended against the use of railroad commuter facilities, while encouraging expanded highway capacity between downtown Pittsburgh and its eastern suburbs.

On October 27, 1965, the Authority commissioned Parsons, Brinckerhoff, Quade and Douglas ("PBQ& D"), consulting engineers, to prepare a study of the rapid transit needs and solutions for Allegheny County. PBQ&D determined that any general plan for rapid transit should include highspeed corridors from downtown Pittsburgh to the east and south where the highest density of commuter travel could be expected. The study proposed three transit routes approximately geographically concomitant with the East PATway, South PATway and Transit Expressway, which are now incorporated by the Early Action Program.

On July 15, 1968, the Westinghouse Electric Corporation offered to undertake systems management of a preliminary engineering study of the Skybus concept and its application to the Transit Expressway, upon

---

will operate from downtown Pittsburgh to South Hills Village in Bethel Park, a distance of 10.6 miles. Station stopping and starting will be computer-operated. Skybus is a twenty-six passenger vehicle which is scheduled to run at two-minute intervals.

[3] The study was prepared and submitted to the Port Authority pursuant to provisions of Section 13.1 of the Second Class County Port Authority Act, Act of April 6, 1956, P. L. (1955) 1414, §13.1, *as amended*, 55 P.S. §563.1. Section 13.1 requires the commencement of the study of an integrated system of mass transportation within the service area encompassing the jurisdiction of newly formed port authorities.

the condition that Westinghouse not be excluded from bidding upon Transit Expressway equipment. On August 15, 1968, the Authority formally adopted the Early Action Program, including the South Hills Village Transit Expressway, and simultaneously installed Westinghouse as systems manager for the Transit Expressway engineering study.

On June 4, 1970, the defendants County Commissioners committed Allegheny County to the expenditure of one-third of the cost of constructing Early Action, with one-half of the County commitment to be reimbursed by the Commonwealth.

By December 31, 1971, the defendant Authority had expended an amount in excess of $9,000,000 exclusive of prospective contractual commitments and expenses incurred in connection with the Skybus prototype project.

Plaintiffs brought this action to enjoin construction of Early Action on January 10, 1972. On November 6, 1972, the court below enjoined the expenditure of additional funds for the implementation of Early Action unless and until defendants comply with the following provisions of the court's decree nisi:

"1. The Port Authority shall comply with the mandatory requirements of the Port Authority Act of 1959, as amended, by submitting to the [County Commissioners] a revised plan of integrated operation for the Early Action Program . . . [containing] the pattern of integrated operation and schedules showing accurate and current estimates of revenue and expenditures for the. [Program], and the proposed method of financing the [Program].

"2. The Port Authority shall prepare a sound financial plan to pay the existing outstanding indebtedness. . . .

"3. The Port Authority shall prepare and recommend a sound financial plan to pay the currently estimated financial requirements for the [Program]. This

financial plan shall then be submitted to the County Commissioners for their approval. . . .

"4. The Port Authority shall prepare an accurate estimate of . . . the cost of maintaining and operating the Early Action Program. . . . These cost estimates shall be based on updated wage rates and construction costs. These schedules shall be submitted to the County Commissioners for their approval or rejection. . . .

"5. The Port Authority shall obtain a qualified, independent transportation engineering firm's evaluation of the financial and technological feasibility of the Transit Expressway Revenue Line (Skybus). . . . The independent transportation engineering firm shall be chosen after consultation with and agreement by the plaintiffs.

"6. Since the acquisition of the rights of way of the Penn-Central Railroad are indispensable to the Early Action Program, the Port Authority shall obtain and submit . . . tentative agreements evidencing the willingness of the trustees of the Penn-Central Railroad to convey these rights. . . .

"7. The Port Authority shall submit . . . evidence of its ability to obtain from the Interstate Commerce Commission and the Public Utilities Commission, and from other governmental agencies and municipalities whose approval is required for the implementation of the Early Action Program, the permits and approvals necessary for the completion of the Program."

A determination of whether the decree nisi of the court below was properly imposed upon these defendants necessitates the resolution of four basic questions: (1) Has the Port Authority acted in such abuse of its administrative discretion that the court below has properly enjoined the expenditure of funds necessary to effect the Early Action Program? (2) Does the dual posture of the Westinghouse Electric Corporation, as systems manager of a preliminary engineering study

and as a possible contract bidder on Transit Expressway equipment, place that company in a conflict-of-interest position necessitating the injunction of Early Action pending the Program's evaluation by an independent engineering firm? (3) Has the Port Authority failed to comply with provisions of the Second Class County Port Authority Act, Act of April 6, 1956, P. L. (1955) 1414, §§1-13.5, *as amended,* 55 P.S. §§551-563.5, requiring the Authority to submit a revised plan of integrated operation to the Board of County Commissioners? (4) Should laches bar these plaintiffs from the equitable relief they seek?

## I.

Judicial interference with the actions of municipal authorities should not be undertaken in the absence of proof of an abuse of power, bad faith, fraud or arbitrary and capricious action; the courts should be loathe to review the details of the effectuation of actions of municipal authorities. *City of Philadelphia v. Southeastern Pennsylvania Transportation Authority,* 441 Pa. 518, 272 A. 2d 921 (1971); *Weber v. Philadelphia,* 437 Pa. 179, 262 A. 2d 297 (1970); *Eways v. Board of Road Supervisors,* 422 Pa. 169, 220 A. 2d 840 (1966); *Crawford v. Redevelopment Authority,* 418 Pa. 549, 211 A. 2d 866 (1965); *Robinson v. City of Philadelphia,* 400 Pa. 80, 161 A. 2d 1 (1960); *Hyam v. Upper Montgomery Joint Authority,* 399 Pa. 446, 160 A. 2d 539 (1960); *Parker v. City of Philadelphia,* 391 Pa. 242, 137 A. 2d 343 (1958); *Blumenschein v. Housing Authority of Pittsburgh,* 379 Pa. 566, 109 A. 2d 331 (1954), *cert. denied,* 350 U.S. 806 (1955); *Lazrow v. Philadelphia Housing Authority,* 375 Pa. 586, 101 A. 2d 664 (1954). While discretionary power in the hands of a municipal authority or body does not immunize it from judicial review, the scope of that review must be limited to the

determination of whether the exercise of discretion has been flagrantly abused. "*[J]udicial* discretion may not be substituted for *administrative* discretion." *Blumenschein v. Housing Authority of Pittsburgh,* 379 Pa. 566, 573, 109 A. 2d 331, 335 (1954). Where complex questions of technology and finance are resolved by administrative decision, judicial review should be particularly restrictive.

Plaintiffs have alleged, and the court below has agreed, that the Authority has abused its administrative discretion by proceeding with Early Action. The alleged abuses reduce themselves to the following: the Authority has failed to select a less expensive plan of rehabilitating the existing transit system; the Authority has denied "serious consideration" to less costly new alternatives; the Authority clings to a single-minded commitment to the Skybus concept; cost projections are "obsolete, inaccurate and grossly underestimated"; the Authority has failed to obtain necessary rights of way over property owned by the Penn-Central Railroad; and the Interstate Commerce Commission ("ICC") and Pennsylvania Public Utility Commission ("PUC") have not indicated an intent to afford necessary approval to the Program. The lower court's decree nisi has mandated, *inter alia,* that the Port Authority prepare construction and operation cost estimates afresh, that necessary rights of way be acquired or that evidence of the certainty of acquisition be presented, that evidence of the certainty of regulatory approval be submitted and that a feasibility study be prepared by an engineering firm selected with the *plaintiffs'* approval.[4]

The court below has determined that the Authority has improperly placed the cart before the horse by

[4] The issue of conflict of interest is closely related to the court's insistence on an additional feasibility study by an independent firm. It is discussed at length later in this opinion.

continuing with engineering and construction considerations in advance of rights-of-way acquisitions and regulatory approval. An examination of the record, however, indicates that the Authority has reached an administrative decision based upon thorough consultation with engineering management experts.[5] The court below has erroneously substituted its judicial determination for the administrative discretion of the Port Authority.

Pursuant to a contract between the bankrupt railroad's trustees and the Commonwealth, the railroad has already relinquished a section of its main line east of Pittsburgh's downtown station. The agreement requires the Penn-Central to seek ICC approval for the discontinuance of passenger and post office service over the purchased route. Because a segment of its main line is sold and much of its service discontinued, it is reasonable to expect that the Port Authority's purchase of necessary properties will be facilitated. Plaintiffs have proffered no convincing evidence that the purchase of this railroad realty cannot be effected.[6]

---

[5] Michael Baker, Jr., representing one of this country's largest engineering firms, testified that it would be managerially unsound to defer construction until property acquisition was completed because the resultant delay would cause the Authority to face inflated construction prices.

[6] United States District Court approval of the subject sale was ordered December 30, 1970. That order was vacated by the Court of Appeals on December 17, 1971, and a rehearing ordered. *In Re Penn Central Transportation Company*, 453 F. 2d 875 (1971). The Court of Appeals held that the City of Pittsburgh, as creditor of the railroad and lien holder upon the property sold to the Commonwealth's Department of Transportation, was entitled to notice of the hearing held pursuant to the petition to sell the subject property.

At a March 20, 1972, hearing before the District Court, the City of Pittsburgh filed a motion to stay the approval of sale petition pending action by the ICC on the railroad's petitions for

Plaintiffs urge, and the lower court has held, that, pursuant to the Interstate Commerce Act,[7] the ICC must approve railroad line abandonments, and that the Authority's failure to obtain ICC approval of the Penn-Central's abandonment of necessary rights of way, prior to the commencement of Early Action construction, constitutes an abuse of the Authority's discretion since ICC abandonment approval must precede the sale of railroad property.

Similarly, the plaintiffs urge that because the PUC must approve crossing permits which will be necessary for the construction of the Transit Expressway, pursuant to the Public Utility Law, Act of May 28, 1937, P. L. 1053, §409, *as amended,* 66 P.S. §1179, the commencement of construction prior to obtaining necessary crossing permits places the Authority in abuse of its administrative discretion. We do not agree.

Plaintiffs' view is speculative. The failure to obtain ICC railroad abandonment approval and PUC crossing permits, before the commencement of Early Action construction, is not the equivalent of an ICC *denial* of abandonment or a PUC *denial* of crossing permits. Plaintiffs have offered no affirmative evidence that any denial of either abandonment or crossing permit is forthcoming. If the position of plaintiffs is that construction *should not* proceed prior to regula-

---

abandonment. The motion to stay was joined by the railroad's trustees and taken under advisement by the District Court.

The motion is still *sub judice,* but in view of the time elapsed, it must be presumed that the District Court is awaiting action on the abandonment petitions before the ICC. As plaintiffs contend, the sale is not final, but neither is there any indication that the sale will not become final and effective.

[7] "[N]o carrier . . . shall abandon all or any portion of a line of railroad . . . unless and until there shall first have been obtained from the [ICC] a certificate that the present or future public convenience and necessity permit of such abandonment." 49 U.S.C. §1(18) (1959).

tory approval, then no abuse of discretion is demonstrated, only a belief that we should substitute our judicial judgment for the discretion of the Port Authority. This we cannot and will not do.

Plaintiffs urge that the Authority has also abused its discretion by relying upon inaccurate, outdated cost estimates. The decree nisi requires that new cost estimates be submitted.

Federal and State agencies, bearing the great bulk of the cost of Early Action,[8] have not challenged the Authority's cost computations. The federal Urban Mass Transit Authority ("UMTA") offered testimony that it considers the amount budgeted to Early Action to be *final.* UMTA has continued to grant federal funds to Early Action according to the cost estimates submitted by the Authority.

It is plaintiffs' position that inflationary costs have outdated the amounts budgeted to the construction, operation and maintenance of Early Action. The decree nisi has mandated the preparation of three new cost estimates: (1) the cost of maintaining and operating the presently existing system; (2) the cost of maintaining and operating Early Action and (3) the cost of constructing, maintaining and operating a county-wide system. Neither plaintiffs nor the court below has cited authority for the proposition that cost estimates updating may be ordered, *absent fraud or abuse of power,* by a court reviewing the discretionary action of municipal authorities. Though further cost calculations might indicate that the proposed plan is incomplete in some respect or that its undertaking will involve a greater expenditure of money than initially anticipated, the determination of such considerations has been

---

[8] The approximate projected cost of Early Action is $228,000,000. Two-thirds, or approximately $152,000,000, will be supplied by the federal government, $41,000,000 by the Commonwealth and about $35,000,000 by the taxpayers of Allegheny County.

placed in the first instance in the discretion of the Port Authority. Unless it can be shown that the judgment of the Authority has been fraudulently motivated or completely lacking in responsibility, it should not be disturbed. *Hyam v. Upper Montgomery Joint Authority*, 399 Pa. 446, 160 A. 2d 539 (1960).

Another of plaintiffs' specific allegations of abuse of discretion posits that the Authority's irreversible commitment to the adoption of Skybus technology has blinded it to the reality of less costly and more dependable alternatives. Plaintiffs point to a July 1969 executive session of the Port Authority where, following a demonstration of the Skybus concept by the Westinghouse Electric Corporation and the exhibition of an alternative deemed to be considerably less expensive,[9] the Authority voted seven to two to submit its application for funding to UMTA on the basis of Skybus. It is difficult to discern how an abuse of administrative discretion is demonstrable by the recitation of facts indicating that one of several alternative modes of rapid transit is selected after an examination of each.

The selection of one among several alternatives is no basis for the review of that decision in the absence of fraud or caprice. Cf. *Eways v. Reading Park Authority*, 385 Pa. 592, 124 A. 2d 92 (1956). We find no abuse of discretion by the Port Authority.

## II.

The question whether the role of Westinghouse as both manager of the Preliminary Engineering Study

---

[9] The Westinghouse Air Brake Company ("WABCO") presented a system which would have provided savings in that it would utilize existing trolley rights of way and "rolling equipment" less expensive than the Westinghouse Electric Corporation Skybus. WABCO also submitted an alternative plan for improvement of the present system at a considerable saving.

*and* contract bidder on Transit Expressway equipment places the company in a conflict-of-interest position was resolved against the Port Authority in the court below. Paragraph five of the decree nisi requires that, before proceeding further with the implementation of Early Action, the Port Authority must obtain a financial and technological "feasibility" study of the Transit Expressway by an independent engineering firm approved by the plaintiffs.

The plaintiffs' assertion of conflict of interest is based upon the fact that Westinghouse was appointed systems manager of the Preliminary Engineering Study on August 15, 1968. Prior to August 15, 1968, the Authority had utilized the Rust Engineering Company as its independent engineering consultant. On August 15, 1968, the Port Authority adopted a report by the Rapid Transit Committee recommending the Early Action Program and simultaneously appointed Westinghouse to manage the Preliminary Engineering Study.[10] Plaintiffs urge that the decision to embrace Early Action postdated the Authority's appointment of Westinghouse as manager of the subject study, and that, *a fortiori,* the potential existed for Westinghouse to influence the decision to adopt the Program.

---

[10] The court below determined that July 10, 1969, the date the Authority applied for federal funding under the Early Action concept, is the date on which the Port Authority committed itself to Early Action. Though the act of applying for federal funds was a public manifestation of the intent to adopt Early Action, we believe that the August 15, 1968, adoption of the Rapid Transit Committee's recommendation of Early Action is the date more suited to the examination of whether a conflict of interest was present. Since the question whether a conflict existed must rest, to some extent, upon the determination of whether the Westinghouse study was influential in causing Early Action's adoption, it must be determined when the Authority actually committed itself to the Program, not when it manifested its intent to the federal government.

The contractual condition imposed by Westinghouse upon its acceptance of the undertaking of this study was that Westinghouse "not be excluded from competition on any equipment which might be procured as a result of this study." Since Westinghouse has invented and engineered the Skybus prototype, and could be the company awarded the equipment contract if the Transit Expressway is implemented, the engagement of Westinghouse as preliminary engineering consultant is seen by the plaintiffs, and the court below, as an act which so tainted the 1970 study that the implementation of the Transit Expressway should not proceed unless an independent engineering study is conducted.[11]

The plaintiffs present a bifurcated conflict-of-interest argument. First, it is contended that the Authority's sanction of such a conflict represents an abuse of its discretion. Concomitantly, the Authority's countenance of the Westinghouse conflict is seen by plaintiffs as a violation of the State Adverse Interest Act.[12]

We reject the notion that a conflict of interest exists which necessitates the "feasibility" study ordered by the court below. The study, conducted under the systems management of Westinghouse, is entitled: "Preliminary Engineering Report . . . January, 1970." Defendants take the position that standard engineering procedure dictates a three-stage development of engineering considerations: (1) the feasibility report, (2)

---

[11] Paragraph 5 of the decree nisi requires an independent study by an engineering consultant chosen "after consultation with and agreement by the plaintiffs." Even assuming the position that a conflict of interest exists which requires an "independent" engineering study, there is no support in law or fact for the position that the selection of an "independent" consultant requires the approval of the plaintiffs. In fact, it seems that the consultant selection process could thus be turned to the advantage of plaintiffs' viewpoint.

[12] Act of July 19, 1957, P. L. 1017, §3, 71 P.S. §776.3.

the preliminary engineering study and, finally, (3) specifications determinations. There is manifest factual support for the position that the 1970 Report was not a "feasibility" study upon which the decision *whether* to implement the Transit Expressway would hinge, but rather a preliminary engineering study conducted for the purpose of determining *how* Skybus technology could best be adapted to the Transit Expressway concept.

Before its commitment to Early Action on August 15, 1968, the Authority had benefited from feasibility studies by a variety of engineering consultants: Parsons, Brinckerhoff, Quade and Douglas, the M. P. C. Corporation, the Transportation Research Institute and Richardson, Gordon and Associates. That the recommendations of these various studies indicate both favorable and unfavorable responses to the feasibility of the Transit Expressway and Skybus technology could not justify our intervention in the administrative decision reached when the Authority embraced the Skybus concept on August 15, 1968. It is difficult to discern how the publication of a preliminary engineering study by Westinghouse subsequent to the decision to adopt Early Action has given rise to a conflict of interest justifying intervention by the court below.

The contract for the Westinghouse role in the preparation of the Preliminary Engineering Report dictated "that *Westinghouse, in performing any of its services hereunder, shall not be deemed to be advisor or consultant to Port Authority and that any recommendations concerning the future use of any data,* designs, estimates, findings, or other things developed by Westinghouse hereunder *shall be made by others.*" (Emphasis added.) By the express terms of the written contract authorizing it to manage preparation of the Preliminary Engineering Report, Westinghouse was barred from making engineering recommendations.

Since the Westinghouse study postdates the Authority's adoption of Skybus and contract specifications preclude Westinghouse from acting in a recommendatory capacity, and in view of the fact that the Westinghouse role as Skybus innovator makes it the most logical choice for systems manager of a study involving the application of Skybus technology to the Early Action Program, we find no abuse of discretion.

Plaintiffs also claim a breach of the State Adverse Interest Act,[13] Act of July 19, 1957, P. L. 1017, §3, 71 P.S. §776.3, which provides in pertinent part: *"No State advisor* or State consultant *having recommended* to the State agency which he serves, *either the making of a contract or a course of action of which the making of a contract is* an *express or implied* part, *shall,* at any time thereafter, *have an adverse interest in such contract."* (Emphasis added.) There are compelling factors which preclude the application of the State Adverse Interest Act to this factual setting.

The rationale of the Act's prohibition is that parties undertaking to consult State agencies cannot *recommend* a contract, or a course of conduct leading inevitably to a contract, in which the recommending party will acquire some beneficial interest. The Act does not here apply. It does not apply first because the Preliminary Engineering Report of 1970 postdated

---

[13] The Authority has not yet awarded the contract for Transit Expressway equipment. The fact that the benefit to Westinghouse is prospective only should not, however, preclude a consideration that the Act has been violated.

Plaintiffs cite *United States v. Mississippi Valley Generating Co.,* 364 U.S. 520 (1961), interpreting the federal counterpart of the Pennsylvania Act, for the proposition that although the contract is not yet awarded, the fact that the contractual benefit has not yet accrued to the government advisor does not purge the conflict of its illegality.

Although this argument has merit, we have found the State Adverse Interest Act inapplicable for unrelated reasons.

the Authority's commitment to Early Action and the Skybus technology. The Act does not apply for the additional reason that the contract between Westinghouse and the Authority for the undertaking of the Preliminary Engineering Report proscribed, by its own terms, the use of the Westinghouse systems management position for recommendatory or evaluative activities. That the Authority recognized the potential for conflict of interest is exhibited by the contractual limitations it placed upon the scope of the functions to be performed by Westinghouse. That Westinghouse complied with the proscriptions upon its recommendatory activity is evidenced by its delegation of evaluative tasks to independent engineering consultants.[14]

We therefore hold that the multiple role of Westinghouse as *Report* systems manager and potential equipment bidder does not constitute a conflict of interest. The Westinghouse role is neither statutorily prohibited nor a breach of administrative discretion by the Port Authority.

### III.

Plaintiffs question whether defendants have complied with provisions of the Second Class County Port Authority Act, Act of April 6, 1956, P. L. (1955) 1414, §1-13.5, *as amended,* 55 P.S. §§551-563.5.

Section 13.1 of the Act, 55 P.S. §563.1, dictates the procedure to be followed by the Port Authority in defining the *original* transit system and in effecting its

---

[14] Kaiser Engineers conducted the systems engineering aspect of the study. Parsons, Brinckerhoff, Quade and Douglas formulated fare structure. Richardson, Gordon and Associates were responsible for civil engineering considerations, including mapping, soils investigation, determination of line and grade, design of aerial structures, design of atgrade structures, relocation of utilities, determination of right-of-way requirements and cost estimation for each of the items within the scope of their responsibilities.

subsequent revisions.[15] In compliance with Section 13.1 of the Act, the Port Authority commissioned consulting engineers to conduct a study pursuant to the formulation of an integrated system of mass transit for Allegheny County. After review of the study, the Port Authority prepared and submitted, on September 20, 1961, a plan for an integrated system of mass transit to the Allegheny County Board of County Commissioners. The 1961 plan was remanded by the County Commissioners for the preparation of acquisition and operation cost estimates and finance methodology. The supplement was submitted March 8, 1963. The 1961 plan and its 1963 supplement were approved by the Board of County Commissioners on April 23, 1963.

It is plaintiffs' position that Early Action involves such a radical departure from the concepts developed for, and embodied in, the 1961 plan and its 1963 supplement that the Port Authority has failed in its statutory responsibility to submit a revised plan of integrated operation deemed necessary by plaintiffs to comport

---

[15] Section 13.1 provides in pertinent part: "The Authority, *immediately upon its organization,* shall commence its study of an integrated system of mass transportation within the service area. . . . Thereafter, the authority shall prepare a plan of integrated operation . . . [which] shall be submitted for approval to the board of county commissioners of the county incorporating the authority. . . . *In the event of a revision of the original plan* of integrated operation, *such revised plan* of integrated operation *shall be resubmitted to the board of county commissioners* and shall be acted upon *in the same manner* as herein *provided in the case of the submission* by the authority *of the original plan* of integrated operation. . . . *The authority shall, thereafter, have the right to make such changes in the pattern of its integrated system as it may deem proper,* subject to appeal to the court of common pleas. . . . Upon the recording of the plan of integrated operation, any law to the contrary notwithstanding, *the authority shall have exclusive jurisdiction with respect to all matters regarding a transportation system within the service area* as set forth in the plan of operation. . . ." (Emphasis added.)

with Section 13.1 of the Second Class County Port Authority Act. Plaintiffs point to Early Action's new transit corridors, new stations, new technology and vastly increased cost estimate[16] in support of the position that a revised plan of integrated operation must be developed by the Port Authority and approved by the County Commissioners before Early Action can proceed.

The position that the Act would here mandate the submission of a revised plan of integrated operation is given life only by an out-of-context reading of part of Section 13.1: "The board of county commissioners may approve or reject the plan of integrated operation as submitted or, at any time thereafter, direct the authority to revise the original plan of integrated operation. *In the event of a revision of the original plan . . . [the revised plan] shall be resubmitted to the board of county commissioners. . . .*" (Emphasis added.) An overall reading of Section 13.1, however, indicates that the "plan of integrated operation" refers only to the submission of a plan which defines the "service area and the pattern of its integrated system" at the *outset* of a port authority's organization. That the Act does not require the submission of plans upon the occasion of every significant change in the county mass transit system is best indicated by the express language of Section 13.1: "Upon final approval by the board of county commissioners, the original or revised plan of integrated operation shall be recorded in the office of the recorder of deeds of the county or counties affected thereby and a copy of said plan of integrated operation shall also be filed with the Pennsylvania Public Utility Commission. *The [port] authority shall, thereafter,*

---

[16] Early Action will cost approximately $228,000,000 according to estimates, as compared to the $39,756,050 estimate embodied by the 1961-63 plan.

*have the right to make such changes in the pattern of its integrated system and its service area as it may deem proper, subject to appeal to the court of common pleas* . . . by adopting an amendment to the plan of integrated operation or service area and filing and recording the same in the office of the recorder of deeds and with the Pennsylvania Public Utility Commission as above provided."[17] (Emphasis added.)

The Authority's jurisdiction over all changes in the service area is exclusive and is given life by a recording of the original plan: *"Upon the recording of the plan of integrated operation* . . . *the authority shall have exclusive jurisdiction* with respect to all matters regarding a transportation system within the service area. . . ."* (Emphasis added.)

Since any change in the pattern of integration falls within the exclusive jurisdiction of the Authority, the lower court's determination that the Authority must submit a revised plan of integrated operation to the County Commissioners necessarily required, preliminarily, a finding that the implementation of Early Action will constitute an alteration of the original plan of integrated operation, not merely a change in the pattern of integration.

Practically, it is hard to imagine that the Legislature intended that the Port Authority submit a revised plan of integrated operation to the County Commissioners each time a change in route or physical equipment is contemplated. The legislative intent is discernible by a contemporaneous reading of separate sections of the Second Class County Port Authority Act. Section 13.1 provides that: "[t]he authority shall [after filing of the original plan of integrated operation,] have the right to make such changes in the pattern of

---

[17] The failure to record, as provided, in the office of the recorder and the Public Utility Commission, being ministerial, will not go to the validity of the substantive changes made.

its integrated system and its *service area* as it may deem proper. . . ." (Emphasis added.) Section 2 of the Act, Act of April 6, 1956, P. L. (1955) 1414, §2, *as amended,* 55 P.S. §552, defines the "service area" as "the entire county incorporating the authority and those portions of adjacent counties necessary to permit the authority . . . (iii) to establish transit service between points in the county incorporating the authority and points in adjacent counties where no such service is at the time being rendered and which service the authority, *in its sole discretion,* has determined to be required. . . ." (Emphasis added.)

The express language of these provisions evidences a legislative intent to vest broad discretion in the Port Authority to effect sweeping changes in the mass transit system within its jurisdiction. Submission of a revised plan to the County Commissioners, as plaintiffs seek, is not mandated by the Act. The original plan required by Section 13.1 is intended to define the geographic area within which the Authority may exercise its discretion and the "pattern of its integrated system". The submission of a revised plan is necessary to re-define the geographic area encompassing the Authority's jurisdiction. It is not intended to precede technological changes and capacity expansion within the service area.

We therefore hold that the submission of a revised plan, as mandated by the decree nisi of the court below, is unnecesary in this context.

## IV.

Defendants have interposed the equitable defense of laches. The Authority manifested its public commitment to Early Action by applying for federal funding on July 10, 1969. The Board of County Commissioners committed the county to one-third of the Program's total cost on June 4, 1970. Defendants ask that these

plaintiffs be barred by their delay in failing to bring this action until January 10, 1972. Our resolution of the substantive issues has obviated the necessity to rest the decision of this matter upon a finding of laches.[18]

The decree nisi of the court below is vacated. Each party to pay own costs.

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

I agree the decree of injunction should be vacated and, therefore, concur in the result. I would also direct the dismissal of the complaint.

---

[18] Laches applies where the plaintiff's negligent delay has inflicted prejudice upon defendant. See, Wilson v. King of Prussia Enterprises, Inc., 422 Pa. 128, 221 A. 2d 123 (1966); Brodt v. Brown, 404 Pa. 391, 172 A. 2d 152 (1961).

Defendants expended over $9,000,000 prior to the bringing of this action by plaintiffs. The court below chose June 4, 1970, the date of the County Commissioners' commitment of Allegheny County to one-third the cost of the Program, as the date after which plaintiffs could be charged with notice of the Authority's intention to proceed with Early Action. Seventeen months thus elapsed between notices to the plaintiffs and the bringing of this action on January 10, 1972.

Plaintiffs urge that laches does not apply because (1) the first construction contract was not executed until November 10, 1971, and (2) there is no prejudice because the only persons who could have been prejudiced by the delay, the taxpayers of Allegheny County, are here represented by plaintiffs. There is no merit to either view. Notice of the Authority's intention to proceed with Early Action was imputed to plaintiffs long before the November 10, 1971, execution of construction contracts since great publicity attended the progress of Early Action throughout. The argument that the plaintiffs' posture in this action purges the delay of its prejudicial effect is specious. These plaintiffs brought this action as individuals and mayors of their respective municipalities. They cannot realistically purport to represent the interests of all Allegheny County taxpayers.

Though we reverse the decision of the lower court upon the consideration of substantive issues, the facts presented by this case may have facilitated a determination that these plaintiffs were barred by laches.

The record with full clarity demonstrates that the plaintiffs unduly deferred instituting this proceeding challenging defendant's conduct of a public responsibility of great community interest. In my view it matters little whether plaintiffs' untimely delay is measured from June 4, 1970—as the chancellor did—or from July 10, 1969—as the majority suggests. On this record and the governmental activities—huge public financing and contractual commitments involved—the delay from either date until January 10, 1972, constitutes, in my judgment, a sufficiently long period of non-assertion and non-pursuance of claimed rights by the plaintiff so as to preclude them from obtaining— in so dilatory an action—the relief requested.

This is indeed a classic case for invoking the equitable doctrine of laches. *Siegel v. Engstrom*, 427 Pa. 381, 235 A. 2d 365 (1967) ; *Wilson v. King of Prussia Enterprises, Inc.,* 422 Pa. 128, 221 A. 2d 123 (1966) ; *Gabster v. Mesaros,* 422 Pa. 116, 220 A. 2d 639 (1966).

Mr. Justice NIX joins in this concurring opinion.

---

DISSENTING OPINION BY MR. JUSTICE EAGEN :

I dissent. There is no question in my mind that the Port Authority of Allegheny County has substantially revised and altered its original plan to achieve an integrated transit system and hence, is proceeding illegally absent compliance with the mandates of the Act of April 6, 1956 P. L. (1955) 1414, as amended, 55 P.S. 551 et seq.