623 A.2d 863

FRAZER CONCERNED CITIZENS, by Betty McKENNA, Trustee ad litem, Betty McKenna, William M. Kovic, and Lester J. Artinger

v.

FRAZER TRANSPORTATION AUTHORITY, Frazer Township and Frazer Board of Supervisors, and A.V. Associates, L.P.

Appeal of FRAZER CONCERNED CITIZENS, by Betty McKEN-NA, Trustee ad litem, Betty McKenna, William M. Kovic, and Lester J. Artinger and Frazer Township and Frazer Board of Supervisors.

Commonwealth Court of Pennsylvania.

Argued Oct. 23, 1992.

Decided Jan. 11, 1993.

Reconsidered March 18, 1993.

654

Richard W. Kelly, for appellants Frazer Concerned Citizens et al.

Jonathan B. Robison, Sol., for appellant Frazer Township.

Robert G. Xides, Jr., for appellees Frazer Transp.

Victor R. Delle Donne, for appellees A.V. Associates, L.P.

Before CRAIG, President Judge, McGINLEY, J., and NARICK, Senior Judge.

CRAIG, President Judge.

The Frazer Concerned Citizens, by Betty McKenna as trustee ad litem, is appealing an order of the Common Pleas Court of Allegheny County dated May 6, 1992, that dismissed the statutory appeal of the Concerned Citizens concerning action of the Frazer Transportation Authority, Frazer Township and Frazer Board of Supervisors. This is a case of first impression concerning the Transportation Partnership Act (Act), Act of July 9, 1985, P.L. 187, *as amended*, 53 P.S. §§ 1621–1626, and its procedural requirements for the cre-

ation of "transportation development districts" as applied to second class townships. We must reverse the trial court's decision.

## The Transportation Partnership Act

■ The General Assembly created the Act in recognition that transportation facilities and services are insufficient or unavailable to support economic growth and 'development of specific areas within Pennsylvania. The Act enables municipalities "to cooperate with one another and with the private sector to provide funding for transportation projects in areas where economic growth and development has made the transportation facilities and services inadequate." Section 1.1(b) of the Act. An area where new transportation facilities or services are planned under the Act is called a transportation development district. The General Assembly expressly stated its intention in the Act that "each benefited property within the [development] district, existing and newly developed property, be assessed a portion of the cost of the transportation project." Section 1.1(c) of the Act.

## History

To take advantage of the opportunities provided by the Act, the board of supervisors created the authority by ordinance in May of 1989. The authority began planning for the construction of a highway interchange, and related traffic improvements, that will connect the municipality to Route 28. The interchange is necessary to enable access to a proposed regional shopping mall, business park and hotel that will be constructed by A.V. Associates. A.V. Associates is a Pennsylvania limited partnership and an intervenor on behalf of the authority.

The authority hired Trans Associates, a traffic consulting firm (the consultant), to perform a benefit analysis of properties in the area of the proposed interchange to establish the boundaries of the development district. The consultant measured each landowner's time-saving when traveling to the

proposed shopping mall via the proposed interchange, versus the same trip without the interchange.

On August 29, 1991, the consultant completed its analysis titled "Frazer Transportation Authority Benefit Analysis" (Benefit Analysis). The consultant recommended in the Benefit Analysis that the development district should include all properties with a time-saving of 30% or greater because the consultant considered those properties to have a substantial relationship to the proposed interchange.

On September 6, 1991, the authority sent letters to landowners who would receive a 30% time-saving. The letters, which were sent by first class mail, postage pre-paid, notified the landowners of the authority's intention to form a development district. Specifically, the letters informed landowners of an upcoming advertisement for a public hearing concerning the district, the process for defeating the district's designation, the proposed benefit formula used to calculate assessments, the special assessments, the process to pre-pay assessments, tax diversions and grants-in-aid, and so-called "treasury trips."

On September 23, 1991, the authority printed the following announcement in the *Valley News Dispatch,* a local newspaper of general circulation:

## PUBLIC HEARING

The Board of Directors of the Frazer Transportation Authority will hold a Public Hearing at 7:00 PM, Thursday, October 10, 1991 at the Frazer Township Municipal Building, Butler Logan Road, Frazer. The purpose of the Public Hearing is to provide all interested parties the opportunity to make comments regarding the possible formation of a Transportation Development District and related actions, including imposition of assessments, by the Frazer Transportation Authority.

Thomas J. Affinito
Executive Director
9/23/91

As advertised, the authority held the public hearing and approximately 30 individuals expressed their views. Several representatives of the Concerned Citizens spoke at the hearing.

The authority on October 25, 1991 advertised a special meeting for the submission and consideration of written comments on the proposed district. The advertisement read as follows:

### FRAZER TRANSPORTATION AUTHORITY
### OFFICIAL NOTICE

Dr. Frederick D. Kurn, President of the Frazer Transportation Authority, has adjourned the Public Hearing held on October 10, 1991 until October 29, 1991 at 7:00 PM at the Frazer Township Municipal Building, Butler Logan Road, Frazer. Written remarks will be accepted for inclusion in the hearing record, but no further oral comments will be accepted. The hearing will be immediately followed by a Special Meeting of the Frazer Transportation Authority Board of Directors. The meeting has been called by Dr. Kurn to consider a resolution tentatively designating the boundaries of a Transportation Development District, establishing a formula for imposing assessments within the district, and requesting approval of those actions as well as the Authority's Multiyear Transportation Improvement Program by the Frazer Township Board of Supervisors.

Thomas J. Affinito

Executive Director

10/25/91

At the special meeting on October 29, the authority tentatively adopted the proposed development district and assessment formula by Resolution No. 1991-2. The township then approved the authority's development district and assessment formula by passing Resolution No. 6-1991 at its regularly scheduled meeting on November 4, 1991. Two days later, the authority "established" the development district and imposed assessments under Resolution No. 1991-3.

The Concerned Citizens filed a complaint in equity and a statutory appeal on December 3, 1991, seeking to declare the above resolutions invalid. The trial court consolidated the actions.

After the 1991 election changed the composition of its membership, the board of supervisors held a reorganization meeting for its new members on January 6, 1992. The board of supervisors instructed its new solicitor to enter an appearance in the case *in support of the Concerned Citizens opposition position.*

In response to preliminary objections which had been filed earlier by the township, board of supervisors and authority, the trial court, on January 15, 1992, dismissed the complaint in equity and quashed five of the ten counts of the Concerned Citizens' statutory appeal. The trial court dismissed the remaining counts of the statutory appeal in an order dated May 6, 1992.

 The Concerned Citizens now bring this appeal. The township and board of supervisors have adopted the brief of the Concerned Citizens. Each asserts that the trial court erred (1) in concluding that the Benefit Analysis was adequate to establish the boundaries of the development district, (2) by concluding that the development district was properly approved by resolution rather than by ordinance, and (3) by concluding that the notice and hearing provisions of the act were satisfied by the facts detailed above.[1]

### Benefit Analysis Question

The Concerned Citizens suggest that the trial court erred by concluding that the Benefit Analysis established a substantial relationship between the properties in the development district and the proposed interchange. It argues that the

1. Our scope of review for appeals from the common pleas court is limited to a determination of whether the factual findings are supported by substantial evidence and whether the law was properly applied to the facts. *Municipal Authority of the City of Monongahela v. Carroll Township Authority,* 123 Pa.Commonwealth Ct. 615, 555 A.2d 264 (1989).

comparison used in the Benefit Analysis does not demonstrate a real benefit and should not be used to determine the boundaries of the development district.

Because the shopping mall will only be built if the interchange is constructed, according to the Concerned Citizens, a comparison of time-savings that relies on a hypothetical scenario where the mall is built without the interchange being constructed is arbitrary and capricious, and an abuse of discretion. The Concerned Citizens state, "[n]o relationship between the calculated benefit and any real benefit is established on the record.... [A]ssessed benefits [need not] be mathematically proportional to actual benefits, but [there must] be some relationship beyond the taxing body's *ipse dixit*."

In the case before us, the trial court found that:

A benefit calculated in terms of travel time saved if the mall and interchange were both built can fairly be said to be commensurate with and proportioned to the presumed increase in property value regardless of how the absence of the interchange would affect the amount of traffic on local roads and with or without the mall. The comparison made in performing the benefit analysis is deemed appropriate.

■ The general rule in Pennsylvania is that discretionary powers of municipalities should not easily be disturbed by the courts. In *Flaherty v. Port Authority of Allegheny County*, 450 Pa. 509, 299 A.2d 613 (1973), the mayors of thirteen metropolitan Pittsburgh municipalities filed for a preliminary injunction against the construction of a rapid mass transit system. The plaintiffs alleged, and the trial court agreed, that the Port Authority of Allegheny County abused its administrative discretion by, among other things, failing to select a less costly plan for rehabilitating the existing transit system; denying serious consideration to less expensive transit alternatives; and using cost projections that were "obsolete, inaccurate and grossly underestimated."

The Supreme Court held that the trial court erroneously substituted its judicial determination for the administrative discretion of the Port Authority, explaining:

While discretionary power in the hands of a municipal authority or body does not immunize it from judicial review, the scope of that review must be limited to the determination of whether the exercise of discretion has been flagrantly abused. '[*J*]*udicial* discretion may not be substituted for *administrative* discretion.' Where complex questions of technology and finance are resolved by administrative decision, judicial review should be particularly restrictive. (Emphasis in original.)

*Flaherty,* 450 Pa. at 516–17, 299 A.2d at 618 (citation omitted). Therefore, unless the authority flagrantly abused its discretion, we will not disturb its decision to rely on the Benefit Analysis for the purpose of setting the development district's boundaries.

■ There is nothing in the record to suggest that the authority abused its discretion. Rather, the record contains the testimony of Mark J. Magalotti, the traffic engineer for the authority and principal in charge of the consultants, who described the careful process used to create the Benefit Analysis. He testified as follows:

We began our study by looking at a large initial study area surrounding the proposed program of improvements and subdivided that area into groups in order to conduct the analysis.

Those zones were referred to as parcel groups in our study.

We then estimated the maximum amount of land development that could occur on each of those parcels under study under the existing zoning of those parcels, and there are four current zoning classifications in the initial study area.

Those include commercial, residential, industrial and special conservation.

From this analysis of potential development within each property, we then also calculated the maximum number of trips that could be generated by those properties, and how they might be distributed to the roadway system surrounding the area.

From that traffic analysis, we calculated what they define as the potential benefit to each of those properties with the project in place. That analysis compares the travel times and delays for trips accessing those properties with the proposed projects by the Authority and without the proposed projects.

Magalotti's testimony is uncontradicted, and it demonstrates the methodology used to create the Benefit Analysis.

 Furthermore, the Benefit Analysis is merely required to establish a substantial relationship between the properties in the development district and the proposed interchange. "All properties having a substantial relationship to the proposed transportation facility . . . shall be considered benefited by the facility . . . and shall be included in the transportation development district." Section 2(a) of the Act. A time-saving of 30% is significant enough to allow us to conclude that the properties have a substantial relationship to the proposed interchange. The authority did not abuse its discretion by relying on the Benefit Analysis, and the trial court was correct in concluding that it satisfies the requirements of the Act.

In addition, the Concerned Citizens take issue with the authority's apparent power to conduct a benefit analysis without the citizens having a voice in what process the authority uses. The Concerned Citizens suggest that the process is inequitable because citizens do not have a statutory appeal for protesting the process used to determine the development district boundaries.

 However, these concerns are addressed by the Act's notice and hearing process. The Act requires the governing body to hold a public hearing where landowners can argue to reduce their assessment or to protest their inclusion in the development district. The public hearing is discussed more fully below.

Accordingly, the trial court correctly concluded that the authority did not abuse its discretion in relying on the Benefit Analysis for establishing the boundaries of the proposed development district.

However, the authority did err in creating the development district with respect to the nature of the *municipal* governing body action required under the Act.

### Ordinance Versus Resolution in Relation to Adoption Procedures

The Concerned Citizens contend that development districts must be created by enactment of an ordinance rather than by passage of a resolution. This distinction is important for two reasons: municipal authorities cannot enact ordinances, and ordinances must comply with strict enactment procedures found in The Second Class Township Code, Act of May 1, 1933, P.L. 103, *as amended*, 53 P.S. §§ 65101–67201 (Township Code). We examine the latter point in detail below.

Because section 3(e) of the Act, which describes the procedures for establishing development districts, repeatedly refers to enacting an "ordinance," the Concerned Citizens argue that the General Assembly meant to require an ordinance, not a resolution.

In addition, although § 2(a) of the Act permits municipal authorities to designate development districts, the municipal authority must receive "express approval" from the municipal governing body to do so.

> (a) **Establishment of districts.**—The governing body of any municipality or municipal authority ... may establish within the boundaries of the municipality ... a specific area or areas designated as a transportation development district.... However, a municipal authority may not designate or join in the designation of an area or areas as a transportation development district without the express approval of the *governing body or bodies of the municipality* or municipalities that organized that municipal authority. (Emphasis supplied.)

The Concerned Citizens contend that the express approval must be in the form of an ordinance.

The trial court rejected the Concerned Citizens' argument, stating, "[l]abels are not of controlling significance. When a

municipality takes legislative action, it can do so by ordinance or a resolution of a legislative nature." Rather, the trial court noted, what matters is the nature of the action taken by the enacting body. If the action is "permanent," then it is in the nature of an ordinance and must be enacted according to the Township Code. If the action is merely "temporary" or ministerial, then regardless of the name of the action, it need not be enacted according to the Township Code. The trial court then concluded that:

> [I]t appears at first blush that approving the designation of a transportation development district, adopting a formula for imposing assessments, and approving imposition of assessments would be acts of a legislative character. In reality, however, it was the ... authority that designated the [development] District and imposed the assessments. The [township's] approval of these matters by resolution might reasonably be the transaction of current business.

Therefore, the trial court concluded that a resolution was sufficient for the authority to designate the development district, and for the township to grant its express approval to the authority's designation of the development district.

██ Although we agree with the trial court that the nature of official actions, and not the label attached to those actions, determines the procedures that the township's governing body must follow for enactment, we cannot ignore the fact that the General Assembly repeatedly used the word "ordinance."

> (e) Public hearings shall be required before passage of the *enabling ordinance.* At such public hearings any interested party may be heard. Notice of such hearing shall be advertised at least 15 days prior thereto in a newspaper circulating in such municipalities. Said *ordinance* shall specify the transportation project, the transportation development district or districts related thereto, with respective costs, to be undertaken.... Said *ordinance* shall not become effective if, before the expiration of forty-five days after its enactment, property owners of the proposed district whose property valuation is assessed for taxable purposes shall amount to more than 50% of the total property

valuation of the district shall sign and file, in the office of the prothonotary of the court of common pleas of the county in which the district is located, a written protest against said *ordinance*.

(f) At least 15 days prior to the first notice of the public hearing as required in subsection (e), the municipality or authority shall provide a written notice to the owners of all property in a district setting forth: the total cost of the project proposed, the total amount to be assessed in the district, clear and specific information from which the property owner can clearly understand the amount of assessment to be imposed on the landowners property, and an explanation of the right to object and the requirements to prevent the *ordinance* from becoming effective pursuant to subsection (e). Written notice shall be deemed given when sent by first class mail, postage prepaid, to the person and address listed in the county real property assessment records. No assessment shall be invalid on account of failure of a person to receive written notice. (Emphasis added.)

We must conclude that the General Assembly intended to invoke the Township Code procedures that apply to ordinances. "Where the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." Section 1921(b) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(b) (Statutory Construction Act). The language of these sections is not ambiguous. Therefore, we agree with the Concerned Citizens that the Act requires development districts to be created by enactment of an ordinance.

█ Furthermore, the trial court erred when it concluded that the township's Resolution No. 6–1991 constituted merely "express approval" of the authority's work. When a municipal governing body creates a development district, it must enact an ordinance. Such a governing body may not escape the obligation of enacting an ordinance by delegating a function to a municipal authority and then claiming that, because of the municipal authority's inability to enact ordinances, a resolution will satisfy the requirements of the Act. This is exactly what

happened in the case before us. The township circumvented the ordinance-enactment process by adopting the authority's Resolution No. 1991–2 merely by the passage of the township's Resolution No. 6–1991.

Nonetheless, the authority argues that our interpretation would "invalidate" a significant portion of the Act. The authority draws our attention to § 2(a) of the Act which allows "municipal authorities" to establish development districts. The authority suggests that this section of the Act proves the General Assembly did not intend to require an ordinance for the creation of development districts. The authority believes that requiring an ordinance effectively destroys municipal authorities' ability to establish development districts.

We are not persuaded by the authority's argument. A municipal authority may establish development districts provided it receives express approval from the governing body in the form of an ordinance adopting the municipal authority's work. The authority desires to ignore the language of § 3(e) of the Act requiring an ordinance, but the authority has not offered a convincing reason, or any case law, allowing us to interpret "ordinance" as "resolution."

Also, the authority argues that, because the word "ordinance" does not appear in § 2(a) of the Act, its omission is significant to show that the General Assembly did not intend to require an ordinance. It cites *Corley v. Board of Probation and Parole*, 83 Pa.Commonwealth Ct. 529, 478 A.2d 146 (1984), for the principle that where a section of a statute contains a given provision, and a similar section does not, the legislature intended the difference.

However, § 2(a) of the Act is not similar to §§ 3(e) and (f). Section 2(a) permits municipalities to create development districts, but §§ 3(e) and (f) describe the procedures for creation when, as in this case, such action simultaneously establishes the formula for *imposing assessments* within the district, as is clearly stated in the Official Notice of the October 29, 1991 hearing, quoted in full above. Section 3 of the Act, 53 P.S. § 1623, in its subsections (a), (e), and (f), reserves the power

to impose assessments exclusively to the municipal governing body and explicitly requires that it exercise that power by ordinance.

In addition, the authority asks us to follow *Ashenfelter v. Upper Gwynedd Township Authority,* 76 Montgomery Co. L.R. 85 (1959), a decision from the Common Pleas Court of Montgomery County that interpreted the Municipality Authorities Act, Act of July 31, 1968, P.L. 805, *as amended, reenacted and amended* by the Act of December 21, 1988, P.L. 1329, 53 P.S. §§ 10101–11202. Of course, this court is not bound by common pleas court decisions. However, we are bound by the language of the Act, and it expresses the General Assembly's intentions twenty-six years after the *Ashenfelter* decision. We do not find the *Ashenfelter* decision to be authoritative in this case.

Accordingly, the Act is best understood and applied when it is interpreted to require an ordinance of the municipality to create development districts by way of an express approval for a municipal authority's designation of a development district. In this way, the language of the Act remains intact and municipal authorities maintain a role under the Act. Section 1922(2) of the Statutory Construction Act, 1 Pa.C.S. § 1922(2).

Consequently, the trial court's conclusion, and the authority's contention, that the Township Code does not apply to municipal authorities that create development districts by resolution, because the Township Code applies only to governing bodies, misses the key point. The Act requires an ordinance and, second class townships, such as Frazer, must enact ordinances in accordance with § 702 of the Township Code.

▮▮▮▮▮ Both the Act and the Township Code provide procedures for enacting an ordinance. Where two statutes, or parts of statutes, relate to the same thing, we must attempt to construe them as one statute. Section 1932 of the Statutory Construction Act, 1 Pa.C.S. § 1932.

The specific enactment procedures for the Act are quoted above. They are readily compatible with the requisites of the Township Code, which are as follows:

All such proposed ordinances, unless otherwise governed by law, shall be published not more than sixty days nor less than seven days prior to passage at least once in one newspaper circulating generally in the township. Public notices of any proposed ordinances shall include either the full text thereof or the title and a brief summary . . . setting forth all the provisions in reasonable detail and a reference to a place within the township where copies of the proposed ordinance may be examined. If the full text is not included a copy thereof shall be supplied to a newspaper of general circulation in the county at the time the public notice is published. If the full text is not included an attached copy thereof shall be filed in the county law library or other county office designated by the county commissioners who may impose a fee no greater than that necessary to cover the actual costs of storing said ordinances. In the event substantial amendments are made in a proposed ordinance or resolution, before voting upon enactment, the board of supervisors shall within ten days readvertise in one newspaper of general circulation in the township, a brief summary setting forth all the provisions in reasonable detail together with a summary of the amendments.

Section 702 of the Township Code.

 Read together, the Township Code and the Act establish the procedures for creating a development district. The process is set out below.

 *Notice to Individual Landowners in Proposed District:* According to § 3(f) of the Act, either the municipality or the municipal authority must mail written notices containing the specific information listed in that subsection.

*Notice to the Community:* At least fifteen days after individual landowners are notified, § 3(e) of the Act requires advertisement of a public hearing on the proposed ordinance in a community newspaper.

Also, we note that § 3(f) of the Act permits either the municipality or the authority to notify individual landowners. Section 3(e) of the Act does not make such a distinction. We

conclude, then, that § 3(e) refers to tasks which the municipal governing body must perform because § 3(e) concerns the content of proposed ordinances, which municipal authorities cannot enact, and subsection 3(e) does not mention municipal authorities.

In addition, § 702 of the Township Code, which mentions only the township's "board of supervisors," states that the full text of the proposed ordinance or a detailed summary shall be published. The trial court held that nothing in the Act required the size of the development district to be specified before the public hearing. However, the Township Code requires publication of the proposed ordinance, and the Act expressly requires that the ordinance specify the development district. Therefore, the size of the development district must be described before the public hearing.

*Public Hearing:* At least fifteen days after advertising a public hearing and publishing the proposed ordinance, § 3(e) of the Act requires a public hearing concerning the proposed ordinance. That hearing, therefore, must necessarily be conducted by the township board of supervisors.

*Amendments:* If the township board makes substantial changes to the proposed ordinance, the township must republish a summary of all provisions and amendments to the proposed ordinance within ten days of making the changes. Section 702 of the Township Code. There is no requirement for a rehearing after amendments.

The authority contends that because other "advertising" statutes explicitly require readvertising after substantial amendments, the omission of a similar provision indicates that the General Assembly did not intend to mandate readvertising under the Act. However, as noted above, statutes concerning the same subject should be read together as one act. The Act and the Township Code must be interpreted in reference to each other, and the Township Code requires readvertisement after amendments.

After complying with these procedures, the township governing body may properly enact the ordinance establishing a

development district. However, that governing body, the board of supervisors in the present case, never enacted an ordinance to establish the development district, and therefore failed to comply with the procedures mandated in the Act and the Township Code.

The rules for enactment of ordinances are strictly applied. The Pennsylvania Supreme Court recently reaffirmed its position that statutory steps for enactment of ordinances are mandatory and nonwaivable. In *Lower Gwynedd Township v. Gwynedd Properties, Inc.,* 527 Pa. 324, 591 A.2d 285 (1991), the Supreme Court invalidated an ordinance enacted under the Township Code because the Lower Gwynedd Township board of supervisors (Gwynedd board) failed to comply with the Township Code's publication requirements.

The Gwynedd board published a summary of a proposed condemnation ordinance in a newspaper, but it failed to provide the newspaper with the full text of the ordinance. Additionally, it did not file a copy in the county law library or a designated office. The Supreme Court held that "[T]he attendance of a large number of people at the hearing, including the appellants themselves ... does not excuse the municipality's failure to comply with the mandatory statutory publication requirements." 527 Pa. at 329, 591 A.2d at 287.

We agree with the trial court's acceptance of the Benefit Analysis as evidence that the authority did not abuse its discretion. Nevertheless, we must reverse the decision of the trial court because the board of supervisors did not enact an ordinance as required under the Act and according to the combined procedural requirements of the Act and the Township Code.

McGINLEY, Judge, concurring.

I agree with the majority that where a transportation authority designates a transportation district, the Transportation Partnership Act requires that the governing body approve such a designation by means of an ordinance rather than a resolution. Therefore I concur in the result in this case.

However, in view of the determination that the procedure by which this transportation district was established was fatally flawed, I would not reach the substantive question of the propriety of the method used by the authority's consultants to determine the boundaries of the district, nor do I believe we should review the validity of the assessment formula.