**Carlisle Borough Incinerator**

*William F. Martson,* for petitioner.
*Tom H. Bietsch,* contra.

EPPINGER, *P. J.,* (Thirty-ninth Judicial District, Specially presiding), November 8, 1973—The Borough of Carlisle (the borough) owns a five-acre plot located at the intersection of Interstate No. 81 (I-81) and Pennsylvania Route No. 34 (Mt. Holly Pike) that used to be a dump. At this point, I-81 is an east-west road, while Mt. Holly Pike runs north and south. Though it is not now an issue in this case, Carlisle claims to have annexed the site, which was formerly in South Middleton Township.[1] Another

---

1. Originally a question was raised in the proceeding claiming the annexation was unconstitutional and that therefore the site was subject to South Middleton Township zoning regulations. It should be noted that in Delaware Institution

proceeding challenging the constitutionality of the annexation is pending before the court.[2]

On January 5, 1972, the borough presented a petition to the court for approval of a solid waste disposal system on this site. The plan is to dispose of waste by thermal reduction in a compact incinerator developed and furnished by Combustion Engineers, Incorporated, Windsor, Connecticut, with disposal of the residue from the incinerator to be made in accordance with state laws and regulations.

The entire installation and operation is subject to the regulations of the Department of Environmental Resources (the department) of the Commonwealth of Pennsylvania under the Pennsylvania Solid Waste Management Act of July 31, 1968, P.L. 788, 35 PS §6001.[3] It was represented to the court

district v. Middletown Township et al., 6 Pa. Commonwealth Ct. 146, 293 A. 2d 885 (1972), it was held that under The Second Class Township Code of May 1, 1933, P.L. 103, added by the Act of August 27, 1963, P.L. 1280, §1, 53 PS §65762, a township's attempted zoning regulations cannot interfere with, hinder and affect the operations of any other political subdivision.

2. The action in equity is Charles K. Fox et al. v. Borough of Carlisle, No. 11 January term, 1972. The court has taken evidence, but the matter has not been placed on the argument list nor argued and is therefore not ready for court action. A decision at this time in the equity action would be appropriate.

3. Standards for incinerator facilities and hazardous solid waste were adopted by the Environmental Quality Board to take effect 15 days following publication in the Pennsylvania Bulletin. Such standards were published in 2 Pa. B. 508 (1973), and while not in force and effect on the day of the hearing in this case are now fully operative: §§75.171, et seq., of Annex A relating to solid waste management as published require conformance with the standards, a written plan of operation, sub-

that the particular type of incinerator had been approved by the department for erection on the proposed site.

The court was requested to approve the site as required by section 2512 of The Borough Code of February 1, 1966, P.L. 1656 (1965), 53 PS §47512. On the borough's petition, the court fixed January 31, 1972, as the time when objections to the location would be heard and directed notices be published so those concerned could state their objections. In response to this order and the notices, objections were filed. At the hearing, the borough presented its plan and the objections were heard. Subsequently the court heard argument.[4]

mission of construction plans and specifications and supporting information and the issuance of a permit. Changes are subject to review and approval and then §75.181 sets forth the minimum design criteria, §75.191 regulations for processing and disposal of waste and §75.201 standards for operation and maintenance.

The Department of Environmental Resources has published a pamphlet under Title 25, Rules and Regulations, Part 1, Department of Environmental Resources, Subpart C., Protection of Natural Resources, Article 1, Land Resources, entitled Chapter 75, Solid Waste Management.

The department has published a further pamphlet entitled "F. Standards for Solid Waste Incinerator Facilities," and has prepared "Instructions for Completion of Incinerator Facility Modules A, B, C, and D," which modules are for use as guides to the preparation of an application for an incinerator permit as required by the Pennsylvania Solid Waste Management Act.

All of these publications are available through the Department of Environmental Resources, Commonwealth of Pennsylvania, P. O. Box 2063, Harrisburg, Pa. 17120.

4. A serious illness incurred by the trial judge delayed the decision in this matter, an unfortunate happening because of the pressure on the borough to provide waste disposal facilities. Happily the borough was able to enter into an agreement with another borough with the capacity to handle the problem pending the outcome of this case.

Section 2512 of The Borough Code, supra, provides that:

"Boroughs desiring to locate any garbage or incinerating plant or sanitary landfill, shall first apply separately or jointly as the case may be to the court of common pleas for *its approval of the location thereof;* whereupon the court shall fix a date when objections to *the location* will be heard and shall prescribe what notice of such hearing shall be given. If at the time fixed for such hearing no objections shall be made . . . the court shall proceed to hear the matter and determine whether *the location* is a detriment to neighboring properties. The finding of the court shall be conclusive, but shall in no way adjudicate any question relating to damages for injury to property." (Emphasis supplied.)

Under this act the court is not charged with examining into the manner of construction nor the workability of the system. If the site is approved as not being detrimental to neighboring properties, the installation and operation of the system would have to comply with the provisions of the Pennsylvania Solid Waste Management Act and the rules and regulations adopted pursuant to the act by the department, supra.

In Greater Greensburg Sewage Authority et al. v. Hempfield Township et al., 5 Commonwealth Pa. Ct. 495, 291 A. 2d 318 (1972), the court held that the Pennsylvania Solid Waste Management Act, supra, "resulted in a limited preemption of the field of regulation of sewage facility operations . . ." It follows, the court said, "that no municipality may enact an ordinance with provisions conflicting with a statute enacted by the legislature as to the requirements for licenses." Even a home-rule amendment does not deprive the state of any

sovereignty over the municipalities in respect to sanitation for the promotion and preservation of the public health, which sovereignty it elects to exercise by general law: State, ex rel. Southard v. Van-Wert, 126 Ohio St. 78, 184 N.E. 12 (1932). In the Solid Waste Management Act, the legislature has provided sufficient guidelines to the department in making rules and regulations so that there is not an unconstitutional delegation of legislative power: Commonwealth v. Haines, 55 D. & C. 2d 204, 85 York 161 (1972).

With these principles in mind, we do not believe the court could, with any authority, approve a particular system for disposal of solid waste. Nor would it be incumbent on the court to supervise the operation of the system nor see that it continues to work as it was intended to. Such approval and supervision are obviously the pre-empted function of the Department of Environmental Resources. In fact, the statute itself mentions nothing about approval of a system. It only places on the court the burden of *approving the location:* Sewickley Borough, 66 Pitts. 409, 32 York 52 (1918).

Section 2512 of The Borough Code was inserted in 1909, and, as originally enacted, the word "unwarranted" appeared before the word "detriment." However, in 1915, the word "unwarranted" was deleted. While we will discuss the particular plant to be installed, this discussion should not be interpreted in limiting the use of the tract for such facility alone. As heretofore mentioned, it is the court's view that our only function is to approve or disapprove a location—not to pass upon a particular plant for that location.

The borough faced a serious problem resulting in a solid-waste disposal study. Out of this study came

the decision to erect an incinerating plant on this site. The plant, called a "Cumbustopack," was observed in operation in Windsor, Connecticut. The operation began as all solid waste (wet garbage, tin cans, crates—everything) was deposited in the receiving room. (There are no outdoor operations.) In the receiving room the waste was mixed together and put into the hopper. It was ignited by a piece of paper doused with kerosene. Incineration takes place through the use of a forced draft.

The by-products from the incineration include sterile ash, water, vapor, carbon dioxide, nitrogen and perhaps some sulphur dioxide. There is no odor. The ash is disposed of as fill. The vapor and gasses are emitted into the atmosphere through a 46-foot stack, and the water and watery substances are dumped into the sewer. The operation was fully described and the objectors' attorneys had an opportunity for vigorous cross-examination of the engineer who specified the plant and one employed by the manufacturer.

After hearing the evidence, the court is satisfied that the plant is pollution free according to the standards of the department; that no offensive odors would be emitted from the operation; that it would be sanitary and not susceptible to rodent infestation and that there would be no offensive accumulation of rubbish. Thus the court is of the opinion that the proposed plant is not, per se, harmful to the community and would not constitute a nuisance. It is not an offensive incinerator that would give off all sorts of odors, ash and other by-products which would be generally harmful.

But the question is, will the installation be detrimental to the neighboring properties in some way, though not generally detrimental. On this subject

the court's finding is conclusive, although not determinative of any damages for injury to property.

At the time of the hearing, the borough was in the process of erecting a large garage and a warehouse on a part of the site. The 100 foot by 300 foot Butler building is now completed and it is proposed that the incinerator will be located south of the new building. As a consequence of these projects, the old dump has been cleaned off, but a line of trees obscures a great deal of what is on or will be on the tract from neighboring properties.

The tract is "L" shaped and is reached via an improved road running from the Mt. Holly Pike. Going onto the tract coming from Carlisle would require a left turn and exiting going back to Carlisle would require a right turn.

It is difficult to characterize the areas around the intersection of I-81 and the Mt. Holly Pike. Really it is a montage of many land uses. The northwest quadrant is completely commercial, housing a large shopping mall. The northeast quadrant is virtually vacant land, except for one house. The southwest quadrant contains the only truly residential development, while the southeast quadrant contains the site proposed for the incinerator, a gas station with some junked cars behind it, a radio station with its tower, some woodland, a little-used railroad spur and, if extended far enough, some farm land. A stream flows on the east side of the incinerator site just beyond the railroad spur and this stream is highly regarded by sportsmen.

The focus of section 2512 of the Borough Code, supra, is to put upon the court the duty of thoroughly examining all of the surrounding circumstances. If the installation is not detrimental to neighboring properties, then the court is to approve

the site. If, in the view of the court, it is detrimental, then the site cannot be approved.

Something that is detrimental to the neighboring properties hurts, injures or damages them. And recognition of this definition adds complexities, because the act specifically notes that approval "shall in no way adjudicate any question relating to damages for injury to property."

Neighborhood and neighboring properties are relative terms: Rea v. Pittsburg & Connellsville Railroad Co., 229 Pa. 106, 78 Atl. 73 (1910). During the hearing, it was obvious that the borough wanted to limit the concept to adjoining properties so the court would have to find a detriment to the adjoining properties. The objectors argued for a much broader definition—one that embraced a great deal more area and, carried to the extreme, would include some manufacturing and other non-residential and non-commercial uses not mentioned in description of the land uses at the intersection. We believe the true definition lies somewhere between the two contentions. It is not synonymous with territory or district. It is a collective noun that suggests proximity and refers to units that make up the whole. Neighborhoods tend to terminate at natural or artificial boundaries and remote areas may find themselves without neighboring properties, except those which adjoin. Each situation must be examined in its own context. Surely, a neighborhood is not everything that can be seen as one witness contended. It may be more, it may be less. The word neighborhood does not connote large geographical areas with widely diverse interests.

In our consideration of the phrase neighboring properties, it is difficult for us to conceive of those properties on the north side of I-81 as neighboring.

But, for the purposes of this discussion, we will include in the phrase neighboring properties those areas described as being within the quadrants of the intersection of I-81 and the Mt. Holly Pike mentioned above. In the court's view of the situation in this case, the properties north of I-81 are virtually out of sight of the proposed location of the incinerating plant and only the stack, if anything, would be visible from that area. Generally speaking, therefore, any effect that the use of the proposed site would have on the properties north of I-81 is largely speculative and we cannot conceive any detriment to these properties.

As we've mentioned before, the southwest quadrant is the most residential of all the areas. But even here, a view of the proposed plant is obscured because of the set-back from the Mt. Holly Pike and the line of trees that form a sight barrier between the residential area and the proposed incinerator.

In the quadrant with the proposed plant is the gas station, the radio station, the railroad, virtual wasteland between the railroad and the stream and properties in rather close proximity that are now classified as farms but have potential for residential development. Again, the line of trees and the natural and artificial barriers form some obstacle to the incinerator having a detrimental effect on these properties.

So we would have to conclude that, unless there is something obnoxious about this plant, it would not be detrimental to neighboring properties.

The objections raised by the witnesses can be put into several categories. Some can be placed in the category of understandable concerns arising out of the mere presence of a rubbish incinerator. Among these are expected noise, gas emissions, problems

of disposal of solid refuse, sewer overload, possible fish kill, presence of vermin and possible explosion of aerosol cans. The borough says these are unfounded fears.

The borough has a duty to provide an adequate solid-waste disposal system. The view we have when "garbage men" strike in our big cities speaks loudly of the need for such a system in this day and age. The gathering and disposal of refuse and ashes has been held by our Supreme Court to be a health measure: Kunz v. Titusville, 373 Pa. 528, 97 A. 2d 42 (1953), and therefore a legitimate exercise of the public or governmental function within the police power.

In these proceedings someone has to have the burden. The general rule is that courts should not interfere with actions of municipal authorities in the absence of an abuse of power, bad faith, fraud or arbitrary or capricious action: Flaherty v. Allegheny Port Authority et al., 450 Pa. 509, 299 A. 2d 613 (1972); Crawford v. Redevelopment Authority, 418 Pa. 549, 211 A. 2d 866 (1965).[5] While we are not dealing in the precise areas in which these cases were decided, we conclude that good faith has to be accorded the actions of the borough in selecting the site. Thus it is not incumbent on the borough to show that the operation of an incinerator will not be a detriment. The objectors must show that it will be; that is that their objections are valid.

The objections listed under the category of understandable concerns are surely pure speculation. There is no solid evidence that any of the consequences will occur. Rather, these objections are the

---

5. See also Parker v. Philadelphia, 391 Pa. 242, 137 A. 2d 343 (1958).

fears engendered by the mere idea of an incinerator on this site. That in the past some incinerators have been objectionable is not ground to conclude that one on this site—installed and operated under the rules and regulations of the department—will be objectionable. So we cannot conclude that the objectors have established any detriment to neighboring properties on the basis of these concerns.

There is also associated with these concerns a sort of intangible feeling that makes acceptance difficult. One witness for the objectors gave it a name: "Adverse negative psychological effect on the neighborhood." In Wood v. Town of Wilton, 240 A. 2d 904 (1968), where there was an action for an injunction to restrain the town from using land for a dump, the trial court, in granting the injunction, "concluded that the specter of a 'town dump' blights an area with a 'black psychological overcast' and that the operation would have a depressing and depreciating effect on the plaintiffs' properties." After taking account of the trial court's finding as quoted above (at p. 907), the Supreme Court of Connecticut said (at p. 908): "(T)he finding discloses that this fear of a 'town dump,' although real, has no basis in fact." The court then went on to say that "the anticipation by the plaintiffs of the possible consequences of the defendant's proposed use of the property can be characterized as a speculative and intangible fear." The appellate court found instead that the disposal area for garbage involved in this suit was not a garbage dump as such expression is usually used, but was a sanitary landfill-garbage disposal operation. The trial court was reversed and the town's proposed landfill was not enjoined.

We find here that the fear of an incinerator,

though real, has no basis in fact. The State supervision, the fact that boroughs are not absolved of liability from damages resulting from the operation of an incinerating plant (Briegel v. City of Philadelphia, 135 Pa. 451, 19 Atl. 1038 (1890); Siwak v. Borough of Rankin, 72 Pa. Superior Ct. 218 (1919); Wilson Borough Incinerating Plant, 19 Mun. 129 (1926)), and a remedy by bill in equity available to enjoin an operation which becomes a nuisance (F. J. Kress Box Co. v. Pittsburgh, 333 Pa. 121, 4 A. 2d 528 (1939)), offers adequate safeguards against the fears becoming reality.

The next category of objections may be classified as those which offend ideas of esthetics. Listed among these are destroying the "prettiest entrance to Carlisle," introducing an unsightly industrial operation into a non-industrial area and thereby returning a detriment to the neighboring properties.

We do not find that these results occur. In the first place, apparently, the borough can, without hindrance, erect the large garage on the site: Delaware Institutional District v. Middletown Township, et al., supra (1972). So, if the neighborhood had an exclusively residential characteristic (which it did not), it has already been legally altered. Remember, that depending on how far one wants to extend the neighborhood concept, there are many non-residential uses in the area.

But most notable to the court, is what has happened and will happen to an abandoned, rat-infested town dump. The lot has been graded, a reasonably attractive building has been erected on it and indications are that the area will be maintained in a neat and orderly fashion with borough employes in and about the area a great deal of the

time. They will be present to combat some nuisances that have already existed if they reoccur. The entire plan for the site, including the proposed incinerator, has, in effect, cleaned up an awful mess; and, if anything, should result in an increase in the value of the properties in the neighborhood. Is it better to say: "My property is next to the old town dump," or "My property is next to the new borough incinerator"? To ask the question is to answer it. We repeat, set back and sight barriers do much to obscure improvements on the plot.

Separate consideration is given to the objection of increased traffic in the neighborhood caused by the plant's location. We are not persuaded there will be any noticeable increase in traffic at an already busy intersection. But, if there is, it will not be detrimental to neighboring properties. We acknowledge that trucks hauling the rubbish will have to travel to the plant. These are the same trucks that pick up the rubbish in the borough now. So there will be rubbish trucks on the Mt. Holly Pike, and, conceivably on I-81.

Suppose the present site is rejected but that another site so remote that no objections can even be raised is selected. And suppose further, this site is reached by traveling south from I-81 on the Mt. Holly Pike. Then all the trucks that will be traveling on the Mt. Holly Pike to reach the proposed site would still be traveling on Mt. Holly Pike—only for a greater distance—to reach the assumed site.

Further, we are not persuaded that a mere increase in traffic is detrimental to a neighborhood, though it may cause inconvenience to the residents. The real estate expert for the objectors testified that high usage interstate highways do not damage the value of residential properties. People

have the tendency to build close to them, despite the traffic engendered.

It was this same expert who echoed the words of many of the objectors in predicting loss in property values. He said that the incinerating plant would destroy the homogeneity of the neighborhood and this would be one of the causes in the decline in property values. It was this real estate man's opinion that people would not build homes near an incinerating plant. It was his view that the potential for housing development in the neighboring properties would be lost and houses already there would decline in value. As to the former lost potential for residential development, the expert's opinion assumes that the best prices paid are for land for residential purposes. This is a fact which may not be true. We believe experience indicates other potential uses of land may make it more valuable.

The worth of any property depends not alone on its location but also upon what services are available to it. The court was persuaded the borough seriously needed a solution to the problem of disposal of solid waste. The construction and operation of an approved incinerator inures to the benefit of every property owner in the area, because it takes care of a serious problem. Like having city water and sewer, a good solid-waste disposal system is an asset. So a cogent argument can be made that the erection of the incinerator will enhance the value of all property. But will it do this in a way that some will suffer? That's the question the objectors want answered.

We are fully aware that we cannot answer it to the satisfaction of those who fear the implication of such a plant near their property. But we are encouraged and persuaded by the evidence submitted

by the borough that people do build homes near such installations. That evidence was evidence of experience in a particular community. It was not merely the opinion of a real estate expert. Pictures were presented to show that people built homes in close visual proximity to an incinerator. So we are not persuaded that the objectors have shown that there will be any detriment to their properties by a decline in value. Indeed, the plant may have just the opposite effect in the circumstances.

The word homogenous suggests sameness. As we've already indicated, there is great diversity of use being made of the properties at the I-81—Mt. Holly Pike intersection. The argument that the homogeneity of the neighborhood will be destroyed to the detriment of the properties simply cannot prevail.

We have carefully examined, but cited sparingly, all of the Pennsylvania lower court decisions which counsel have called to our attention.[6] They are all rather old. The principal lesson we have learned from them is that each case has to be decided on its own set of facts. And this is particularly true where an act provides that the findings of the common pleas court shall be conclusive—a factor which has apparently resulted in a lack of appellate court decisions.

There is only one intersection of I-81 and the Mt. Holly Pike in Carlisle. There is only one place where

6. Greensburg Garbage Disposal Plant, 2 D. & C. 141, 11 West. 43 (1922); Aliquippa Borough Garbage Site, 18 Beaver 212, 48 Mun. 277, (1956); Wilson Borough Incinerating Plant, supra (1926); Farrell Borough, 9 Mun. 65 (1917); Coraopolis Borough Petition, 7 Mun. 44, 63 Pitts. 511 (1915); McKees Rocks Petition, Pitts. 973 (1924); Sewickley Borough, supra (1918).

the quadrants of the intersection are occupied as they are here. There is only one present time. It is difficult, if not impossible, to equate the circumstances of the past (from 58 to 17 years ago) with those of the present. Technology, and even attitudes, have changed and will keep changing.

This opinion is the result of the careful examination of the facts which we believe the precedents require. We have found that the use of the site for an incinerating plant would not result in a detriment to neighboring properties.

## ORDER

Now, November 8, 1973, the court having examined into the evidence taken at a hearing of which due notice had been given to permit objectors to come forward with objections, and the court, having heard such objections and arguments and having carefully considered the matter the court finds that a solid-waste incinerating plant, the installation of which is licensed and approved and the operation there monitored and supervised by the appropriate authorities of the Department of Environmental Resources of the Commonwealth of Pennsylvania under the provisions of the (Pennsylvania) Solid Waste Management Act of 1968, 35 PS §6001, and rules and regulations adopted pursuant thereto, is not detrimental to neighboring properties.

It is further ordered that if approval of such site by the court for the location of the said incinerating plant is necessary, the same is hereby approved.

It is further ordered, however, that the subject matter in controversy presented to the court in the petition to the above-captioned number and term

has been authoritatively and finally settled by the order of the court of January 17, 1970 (to No. 362 February term, 1970), and that the issues raised by this petition are moot.

Costs of these proceedings shall be paid by the Borough of Carlisle.

Exceptions are granted to the objectors.