128 Pa. Commonwealth Ct. 292 (1989)
563 A.2d 565
SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Appellant,
v.
ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW et al., Appellees.
Commonwealth Court of Pennsylvania.
Argued June 7, 1989.
Decided July 31, 1989.
*295 David P. Bruton, Alfred W. Putnam, Jr., Barbara J. Lipshutz, Drinker Biddle & Reath, Philadelphia, for appellant.
Irv Ackelsberg, Deborah Harris, Community Legal Services, Philadelphia, for ACORN, CBNP & CEPA.
Angel Ortiz, David Cohen, Philadelphia, for appellees.
Robert L. Martin, Lee, Martin, Green & Reiter, Bellefonte, for amicus curiae Pennsylvania Assoc. of Mun. Transp. Authorities.
Before CRUMLISH, Jr., President Judge, and DOYLE, BARRY, COLINS, PALLADINO, McGINLEY and SMITH, JJ.
McGINLEY, Judge.
The Association for Community Organizations for Reform Now (ACORN), the Committee for a Better North Philadelphia (CBNP), the Consumer Education and Protective Association (CEPA),[1] (collectively, Appellees) instituted this action on April 5, 1989, by challenging the final action of the Southeastern Pennsylvania Transportation Authority (SEPTA) raising fares on its City Transit Division. On April 7, 1989, Lucien E. Blackwell (Blackwell), Marian B. Tasco (Tasco), Augusta A. Clark (Clark), George Burrell, Jr. (Burrell), David Cohen (Cohen), Angel Ortiz (Ortiz), and James B. Tayoun (Tayoun), members of the Philadelphia *296 City Council, intervened. The Philadelphia Court of Common Pleas (court of common pleas) sustained Appellees' statutory appeal under Section 303(d)(9) of the Pennsylvania Urban Mass Transportation Law (Act 101),[2] vacated the challenged fare increases and remanded the matter to the SEPTA Board.[3] SEPTA appeals.[4]
In late February, 1989, SEPTA posted and published notice of proposed tariffs increasing the fares in various SEPTA divisions, to take effect on April 9, 1989. The tariffs included these changes in rates for City Transit riders:
1. Tokens  increased from $0.85 to $1.05, an increase of 23%;
2. Transfers  increased from $0.25 to $0.40, an increase of 60%;
3. Weekly Trans Pass  increased from $12 to $15, an increase of 25%;
4. Monthly Trans Pass  increased from $45 to $55, an increase of 22%.[5]
*297 Five hearings on the tariff proposals were held in a three day period during the week of March 27, 1989, in Bucks, Montgomery, Chester, Delaware counties and in Philadelphia. At a meeting of the SEPTA Board on April 5, 1989, the SEPTA Board approved the tariffs with one modification; the token charge was increased from $0.85 to $1.00 rather than $1.05.
The increases were stayed by order of the court of common pleas on April 7, 1989, but only insofar as they applied to SEPTA's City Transit Division. The court of common pleas on April 26, 1989, concluded that SEPTA's proposed increase on the City Transit Division was procedurally and substantively flawed. Procedurally, Judge Samuel M. Lehrer noted: an alleged refusal to permit CEPA's counsel to ask a question; a more general failure to provide a meaningful hearing; and a failure to provide CEPA with the proposed allocation of subsidies among the four divisions for fiscal 1990. Substantively, the court of common pleas concluded that SEPTA abused its discretion on the basis of Section 341 of Act 101[6] and Section 1601(a)(2) of the Congressional Urban Mass Transportation Act (federal statute), P.L. 88-365, July 9, 1964, 78 Stat. 302, 49 U.S.C.App. § 1601(a)(2).[7]
On May 8, 1989, the SEPTA Board met in a special meeting and decided to implement the City Transit increases on May 11, 1989, asserting a right to automatic supersedeas *298 under Section 303(d)(9) of Act 101. On May 9, 1989, the court of common pleas, upon application of the Appellees, vacated the purported supersedeas and enjoined the City Transit increases. On May 12, 1989, this Court affirmed the court of common pleas' order of May 9, 1989, thereby preserving the status quo pending a resolution of this appeal.
Pursuant to Section 303(d)(9) of Act 101 we are limited in our review of this action to a determination of whether the court of common pleas properly determined that SEPTA's adoption of the proposed rate increase constituted a manifest and flagrant abuse of discretion or an error of law. Consumer Education and Protective Assoc. (CEPA) v. Southeastern Transportation Authority (SEPTA), 125 Pa. Commonwealth Ct. 143, ___, 557 A.2d 1123, 1126 (1989).
SEPTA maintains that the court of common pleas erred in considering the substance of the proposed fare increase and substituting its own judgment for SEPTA's in balancing its budget with government subsidies and passenger fare revenues; and in striking down the proposed fare increase of the City Transit Division on the basis of alleged procedural flaws in the public hearings.
PAMTA submits that the court of common pleas' decision compels transportation authorities to give undue weight to the interests of low income persons and will result in extensive judicial review for every fare increase.

PROCEDURE
The court of common pleas held that SEPTA committed legal error in its conduct of the public hearings. We disagree. Section 303(d)(9) of Act 101 provides that "[p]ublic hearings shall be held prior to . . . determinations . . . which would increase fares." These hearings must be held at a "convenient, accessible location." Section 304(a)(2) of Act 101, 55 P.S. § 600.304(a)(2). Members of the public must be "afforded reasonable opportunity to comment orally and in writing concerning the actions the authority proposes to take." Section 304(a)(1) of Act 101, 55 P.S. *299 § 600.304(a)(1). The court of common pleas relied upon this Court's recent decision in CEPA v. SEPTA, in concluding that SEPTA did not comply with Act 101's requirements in conducting the public hearings. The court of common pleas found CEPA v. SEPTA instructive because this Court held that the public was entitled in advance of a fare increase hearing to examine documentation concerning the basis for the rate structure, and that such information and data is only of use within the context of a meaningful cross-examination of SEPTA officials on how the fare increases were determined. (Opinion of the court of common pleas at 5.) SEPTA distinguishes CEPA v. SEPTA on the basis that there is no complaint that SEPTA did not provide all requested information in its possession in the matter sub judice. The public was provided access to the underlying calculations and premises upon which SEPTA based the proposed fare increase. SEPTA notes also that CEPA v. SEPTA is a prospective decision and that the hearings in question took place prior to that decision. Regardless, SEPTA argues, the hearings were in full accord with the process described in CEPA v. SEPTA and Virgin Islands Hotel Association v. Virgin Islands Water and Power Authority, 465 F.2d 1272 (3d Cir.1972) and the requirement of a meaningful public hearing at which interested persons can present their views and present evidence in support thereof.
Review of the record reveals that the public hearing conducted in Philadelphia was in conformity with Act 101. More than 120 people chose to comment in writing at the Philadelphia hearing;[8] 27 of the 120, including CEPA's counsel, Irv Ackelsberg (Ackelsberg), chose to give oral testimony and some of these 27 questioned SEPTA staff members. Each person attending the hearing received a 28 page briefing packet from SEPTA.[9]
*300 At the Philadelphia hearing, the hearing examiner placed a time limit of five minutes on each person's testimony.[10] Ackelsberg argues that he was unable to finish his testimony. However, the record shows that Ackelsberg had contacted the hearing examiner in advance of the hearing and had been given the choice of speaking for twenty minutes at the beginning of the hearing, or speaking for an unlimited period of time at the end of the hearing.[11] Ackelsberg chose to speak early at the meeting and when he was asked to suspend his testimony after more than one-half hour, he did so without protest.[12] The hearing examiner heard eleven and three-quarter hours of testimony on the proposed rate increases, which included five and one-half hours of testimony from 27 people at the Philadelphia hearing, exclusive of SEPTA officials.[13] In his opinion, Judge Lehrer stated that 60 people at the Philadelphia hearing were not given an opportunity to speak. (Opinion of the court of common pleas at 3-4.) Review of the record indicates that each person who wanted his or her opinion noted on the record was asked to complete a Notice of Appearance; 122 people did so in Philadelphia alone.[14] Of these 122, only 46 indicated any desire to give oral testimony. Of those 46, 27 actually spoke in Philadelphia. Further, the hearing examiner allowed the hearing to continue until each person who wanted to speak had the opportunity to do so.[15]
*301 Judge Lehrer concluded that the crucial and decisive deficiency at the Philadelphia hearing consisted of the refusal of the hearing examiner to allow Ackelsberg to question the SEPTA representatives concerning how the staff arrived at the specific increases in the fare proposal. (Opinion of the court of common pleas at 3.) Relevantly, this exchange occurred:
MR. ACKELSBERG: Well, we did enjoy the slide show, sir. Now, my next question, Mr. McGee, you're aware, are you not, that currently City Transit riders are paying a fare greater, percentage of cost of their trip, than are Regional Rail riders? You are aware of that, are you not, sir?
THE HEARING EXAMINER: Is SEPTA aware that City riders are paying a greater percentage than other riders? Can someone respond to that?
MR. McGEE: You're referring to the operating ratio?
MR. ACKELSBERG: I absolutely am, sir.
MR. McGEE: Again, you are correct in your statement that the operating ratio for City Transit Division is higher than of Regional Rail.
MR. ACKELSBERG: And the numbers that have been batted around, that I'm sure you've heard of, are approximately 66 percent for City Transit and roughly 38 for Regional Rail; isn't that correct?

*302 MR. McGEE: Yes, sir.
MR. ACKELSBERG: Now, when you consider, in your department, this fare increase, this particular fare increase, did you consider the fairness of imposing fare increases like you're proposing here tonight on riders already paying 66 percent of the cost of the ride? Did you consider the discrepancy in operation ratio between the two divisions when you developed this proposal?
THE HEARING EXAMINER: Mr. McGee, was the fairness of those two things considered?
MR. McGEE: Sir, the question you're asking regarding fairness, I think, is a question for the SEPTA Board to answer. The staff role in this proposal was to come up with a proposal that would allow the current level of service to continue in each of the divisions. We've come up with that proposal.
. . . .
MR. ACKELSBERG: No, I'm asking SEPTA staff how that proposal was developed.
THE HEARING EXAMINER: Sir, that's a nonsensical question. We have over 80 people who want to speak tonight.
MR. ACKELSBERG: I think a lot of people in this room would like an answer to that question, sir.
THE HEARING EXAMINER: Ask your next question, please.
MR. ACKELSBERG: Well, I can see this line of questioning isn't getting up [sic] too far and I guess the problem is that we, the riders, would hope and expect that equity, fairness would be one of the factors that SEPTA would think about at least when it comes to the riders who pay more money, and what apparently they're telling us is that fairness isn't something that SEPTA even thinks about. That's for the Board, the politicians, but *303 when the experts get together, all they think about are things like revenue enhancements.
N.T. at 40-41, RR at 133a-135a.
Ackelsberg's comment and/or question was broad, and in light of the number of people who wanted to speak, we find no abuse of discretion on behalf of the hearing examiner. The record reveals that Ackelsberg was aware that Mr. McGee, as Director of Revenue Development, participated in developing the revenue enhancement proposal and knew that SEPTA considered the relative income levels of SEPTA riders in formulating its proposal. Ackelsberg was already aware that this consideration of the income levels of SEPTA riders resulted in the SEPTA staff proposing lower average fare increases for the City Transit Division than for the Regional Rail Division. Ackelsberg also had all of the financial data which formed the basis of the fare increase proposal prior to his oral testimony/questioning.[16] The hearing examiner did not commit a flagrant and manifest abuse of discretion. Ackelsberg, in essence, wanted the SEPTA staff to comment on the fairness of the increase before the record was complete. Judge Lehrer termed this an abuse of discretion and he concluded that SEPTA made its decision without considering the entire record.
Judge Lehrer criticized the hearing procedure, stating that "[t]he short amount of time between the public hearings and the issuance of the Hearing Examiner's report further weakens the validity of these hearings." (Opinion of the court of common pleas at 6.) The court of common pleas relied upon Smith v. Pennsylvania State Horse Racing Commission, 18 Pa.Commonwealth Ct. 1, 333 A.2d 798 (1975) for its holding that the requirement of an administrative fair hearing was violated where a state commission rendered an adjudication one day after the transcript was prepared. In Smith, the commission, which did not hear the case, issued a written opinion less than 24 hours after the 304 page transcript, which included 27 exhibits, was completed. The matter sub judice is distinguishable. The *304 hearings were held before a duly appointed hearing examiner, who mentioned and summarized the testimony of 50 of the 51 people who testified in his report.[17] The hearing examiner was present for all of the testimony, received all of the exhibits, and issued his report on March 31, 1989. The SEPTA Board received the report for review for six days before its public hearing on April 5, 1989. The conduct of the hearing officer and the Board was not improper under Smith.
Finally, Judge Lehrer criticized SEPTA for failing to provide CEPA with budgeted subsidy allocations between divisions for fiscal 1990. However, Act 101 does not require that SEPTA provide a tentative budget before introducing a fare increase.[18] CEPA was provided with SEPTA's fiscal 1989 budget and with actual fiscal 1989 costs through February 1989;[19] SEPTA's expected revenues, by division, for fiscal 1990;[20] and SEPTA's projected costs for the entire system for fiscal year 1990. SEPTA's failure to produce the budgetary information was not an error of law, nor an abuse of discretion.

SUBSTANTIVE
The court of common pleas concluded that SEPTA did not comply with Act 101's and the federal statute's *305 requirement that before raising fares it must consider the effect on energy conservation, and the economic, environmental and social impact of the change in such fare. The court of common pleas found that SEPTA's principal evidence concerning the social and economic impact of the proposed fare increase is contained in SEPTA's Exhibit 44, which asserts that "[e]conomic hardships due to the planned fare increase will be minimal." (Opinion of the court of common pleas at 20.) The court of common pleas found that the record was devoid of evidence factual or expert to support such a conclusion. Judge Lehrer noted that SEPTA did not acknowledge that its proposed fare increase would have any adverse impact at all on the 38 percent of Philadelphia households earning less than $15,000 per year. (Opinion of the court of common pleas at 22.)
In Blumenschein v. Housing Authority of Pittsburgh, 379 Pa. 566, 573, 109 A.2d 331, 334-5 (1954), appeal dismissed, 350 U.S. 806, 76 S.Ct. 68, 100 L.Ed. 724 (1955) our State Supreme Court explained:
[I]t has been established an an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution. It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; judicial discretion may not be substituted for administrative discretion. (Emphasis in original.)
SEPTA faces a deficit of $12 million in this fiscal year, and is losing an additional $60,000 to $80,000 for each day *306 that the City Transit Division fare increase is not in place. (See Exhibit No. 46, RR at 1240a.) The SEPTA Board structured the proposed fare increases on both transit and commuter rails, so as to minimize the effect upon regular, daily riders. The alternative to the proposed fare increase was a curtailment or severe reduction in services, which would ultimately result in a greater increase in private automobile usage, contributing to an extensive deterioration of the regional environment. SEPTA's impact study found that there will be no major employment effects, or property tax and value losses as a result of these actions.[21]
SEPTA's annual operating expenses have risen from $335,989,000 in fiscal year 1980, to an estimated $550,000,000 in fiscal year 1989. Federal subsidies, in the meantime, have shrunk from $60,752,000 (18.1 percent of annual expense) to an estimated $28,174,000 (5.1 percent of annual expense) in fiscal year 1989.[22]
The hearing examiner and SEPTA's Board reviewed the socio-economic impact analysis of the proposed fare increase on SEPTA's City Transit Division (at Exhibit 44, RR at 1218a), wherein SEPTA calculated the percentage of actual riders who would not use SEPTA as a result of the fare increase at 3.3 percent. (RR at 1229a.) Of this 3.3 percent, at least 90 percent of the rides would be taken by other means of transportation. Thus, SEPTA concluded that the actual number of rides not taken would only be 10 percent of the 3.3 percent or .0033 percent. At SEPTA's public hearings only one witness complained that his ability to travel to work would be impaired as a result of the fare *307 increase.[23] The court of common pleas erred in holding that SEPTA did not give the required consideration to the social and economic impact of the proposed fare increases before approving them.
Furthermore, the court of common pleas erred in its assumption that the General Assembly will be responsible to provide the necessary subsidy to SEPTA to preserve the transportation system. Judge Lehrer opined:
The current fare increase does not satisfy totally immediate short term, nor projected long term, needs. There will still be a $5 million shortfall in 1989 and $45 million in 1990, $75 million in 1991 and $100 million in 1992. See Notes of SEPTA Board Meeting.
The so-called balanced budget provision therefore must be construed to be subservient to the primary intent of the Legislature to preserve urban mass transportation.
The General Assembly has delegated to SEPTA the responsibility to determine a fare structure consistent with the purposes of the Federal and State Acts. When it has done so, SEPTA's responsibility ends.
The General Assembly has reserved to itself the responsibility to provide the subsidy necessary to preserve the system based upon SEPTA Board's determination of the total revenue need.
Whether or not that responsibility or intention is one to be enforced in a Court of Law is not for adjudication here.
It is, however, a responsibility clearly enforceable in the political and democratic process  something which we are certain the General Assembly wisely foresaw and itself contemplated in adopting the legislative scheme outlined above.
. . . .
*308 SEPTA argues that its motivation in raising fares in anticipation of a denial by the Governor and the General Assembly of a request for subsidies in fiscal 1990 (beginning July 1, 1989) and years thereafter to meet anticipated operating deficits is a judgment of political expediency. Its success in persuading the General Assembly and the Governor to change their minds is enhanced by being able to argue through the fare increase that its riders are `paying a fair share' of increased costs. That, SEPTA, argues forcefully, cannot constitute an abuse of discretion. (Emphasis in original.)
Opinion of the court of common pleas at 17-18.[24]
The court of common pleas assumed that the General Assembly will rescue SEPTA with additional subsidies and that no fare increase is needed. This substitution of judgment by the court of common pleas is contrary to the mandate of Act 101,[25] and is outside its scope of review.[26] We conclude that SEPTA did not commit a manifest and flagrant abuse of discretion, nor an error of law, and accordingly, we reverse the order of the court of common *309 pleas.[27] The fare increase is a reasonable and necessary response to SEPTA's financial situation and is reinstated.

ORDER
AND NOW, this 31st day of July, 1989, the order of the Philadelphia Court of Common Pleas dated April 26, 1989, at April Term, 1989 No. 1207, sustaining the appeal and vacating the vote of the SEPTA Board of April 5, 1989, is reversed and the fare increase is hereby reinstated. Appellees' Application under Pa.R.A.P. 2155(b) to Allocate Cost of Unnecessary Reproduction is hereby denied.
COLINS, J., concurs and dissents with an opinion.
SMITH, J., dissents.
COLINS, Judge, concurring and dissenting.
I dissent with the majority's conclusions concerning the conduct of the hearings. Specifically, I feel that CEPA's counsel was unduly restricted in his cross-examination of SEPTA employees. I agree with the majority's resolution of the remainder of the issues upon appeal.
However, I would like to note that SEPTA has, itself, delayed the imposition of this rate increase through the institution of unnecessary litigation. Specifically, SEPTA attempted to appeal an interlocutory order, without complying with the mandates of the Rules of Appellate Procedure concerning the filing of such interlocutory appeals. Furthermore, the appellant also filed a request for a supersedeas, based upon questionable authority, which was ultimately denied. The aforementioned tactics have only served to delay this Court's ultimate resolution of the matter on its merits and have generated additional costs and expenses which will eventually be borne by the taxpayers of the Commonwealth, generally, and SEPTA riders specifically.
NOTES
[1] ACORN, CBNP and CEPA are membership organizations which provide counseling, support and advocacy services to low income residents of Philadelphia, most of whom are dependent on SEPTA for transportation.
[2] Act of January 22, 1968, P.L. 42, as amended, added by Section 3 of the Act of July 10, 1980, P.L. 427, as amended, 55 P.S. § 600.303(d)(9). Section 303(d)(9) of Act 101 provides in relevant part that SEPTA may

fix, alter, charge and collect fares, rates, rentals and other charges for its facilities by zones or otherwise at reasonable rates to be determined exclusively by it, subject to appeal. . . . Any person aggrieved by any rate or service or change of service fixed by the authority may bring an appeal against the authority for the purpose of protesting against any such charge, service, or change of service: Provided, however, That the grounds for such suits shall be restricted to a manifest and flagrant abuse of discretion or an error of law; otherwise, all such actions by the authority shall be final.
[3] In its order the court of common pleas found an error of law in the conduct of the public hearing and an error of law and an abuse of discretion in the failure of SEPTA to consider relevant and material factors in support of the fare increase in the City Transit Division of SEPTA. (Order of the court of common pleas, April 26, 1989, Appendix 1.)
[4] The Pennsylvania Association of Municipal Transportation Authorities (PAMTA) has filed an amicus curiae brief.
[5] Exhibit No. 45  Revenue Enhancement Proposal Public Hearing Testimony of SEPTA Staff, Reproduced Record (RR) at 1234a and Exhibit No. 46  1989 Revenue Enhancement Proposal Briefing Packet, RR at 1240a-1260a.
[6] 55 P.S. § 600.341 states in part:

It is the purpose and intent of this article to authorize the authority and the authority is so authorized to do any and all things necessary or desirable to secure the financial and or cooperation of the federal government in any of its operations.
[7] Section 1601(a)(2) of the federal statute indicates that federal aid is not only to maintain transportation per se, but to avoid conditions that would neutralize the effectiveness and cause waste in such federally aided programs as public assistance, aid to the homeless, dependent children, the disabled, the medically indigent, and preservation of the environment. Section 1601b(5) of the federal statute, 49 U.S.C. App. § 1601b(5) speaks directly of the adverse effect of increased cost on lower income persons. Section 1604(i)(3), 49 U.S.C.App. § 1604(i)(3) requires that the recipient of federal grant money consider the social, economic, and environmental effects of the fare increase.
[8] Exhibit No. 77  Public Hearing Testimony Forms for March 28, 1989, hearing at the Philadelphia County Holiday Inn, RR at 157a-1715a.
[9] See Exhibit No. 46  Briefing Packet, RR at 1240a  1267a.
[10] See Notes of Testimony, March 28, 1989, (N.T.) at 60, RR at 153a. Testimony reveals that if this limitation would not have been imposed, the Philadelphia meeting may have lasted until the next day.
[11] N.T. at 128-129, RR at 221a-222a.
[12] N.T. at 53, 54, RR at 146a-147a.
[13] N.T. at 32-34, RR at 280a-282a.
[14] See Exhibit No. 77, RR at 1578a-1715a.
[15] At the Philadelphia hearing, this exchange took place:

THE HEARING EXAMINER: Well, Mr. Koeller, your comments are greatly appreciated and they have been constructive. Is there anyone else in the meeting room who would like to speak this evening?
___
(No response.)
___ THE HEARING EXAMINER: Hearing and seeing no one, I would note that I have in my hand approximately 60 or 70 appearance slips with names, some of which have comments which have not yet been read into the record. In order to streamline these proceedings, because the hour is now 11:20 P.M., I'm going to hand these slips to the court reporter, and ask that insofar as these are legible, that she prepare a list of the names of the people who signed them, and note for the record whether they were opposed or in favor of the items, which they were allowed to check off on here, and insofar as there are comments written on these sheets, I would request that they be transcribed in part of the record, and then I'll need these back as soon as possible with the transcript.
Thank you, ladies and gentlemen. You have been very patient. There being no one further who wishes to present any evidence at this time, I see no reason to schedule a further hearing in the City of Philadelphia, and so, we'll adjourn. . . .
N.T. at 32-34, RR at 280a-282a.
[16] N.T. at 36-37, RR at 129a-130a.
[17] See Report of the Hearing Examiner, March 31, 1989, RR at 1720a-1745a.
[18] Section 334(a) of Act 101, 55 P.S. § 600.334(a) states:

The Board shall establish a fiscal operating year. At least 90 days prior to the beginning of the first full fiscal year after the creation of the authority and, annually thereafter, the board shall cause to be prepared and submitted to it a tentative operating budget and a tentative capital budget for the ensuing fiscal year. The tentative budgets shall be considered by the board and subject to any revision and amendment as may be determined, shall be adopted at least thirty days prior to the first day of the ensuing fiscal year as the budgets for the year. The board shall establish such rules as are necessary for proper observance of the budgets. Simultaneously with the adoption of the budget, the board shall adopt a tentative capital program covering the ensuing six years.
[19] Exhibit No. 71  SEPTA Financial Report for the Period Ending February 25, 1989, RR at 1518a.
[20] Exhibit No. 46, RR at 1240a.
[21] See generally, Exhibit No. 44  Socio-Economic, Environmental and Energy Conservation Impact Analysis for the Proposed April 9, 1989, Transit and Regional Rail Division Fare Increase, dated March 1989, RR at 1218a-1233a.
[22] See Exhibit No. 36  SEPTA Operating Budget for Fiscal Year 1989, RR at 781a-814a. We note that these figures treat senior citizen subsidies as fare box revenue, but the downward trend of government subsidy is the same regardless. SEPTA notes that Philadelphia's city government is attempting to lower the subsidy levels even further by eliminating the peak-time senior citizen subsidy. See SEPTA's brief at 27.
[23] Review Notes of Testimony of the Hearing Regarding Petition for Grant of Supersedeas, April 7, 1989, at 105-124, RR at 1954a-1973a.
[24] The court of common pleas is referring to Section 204(e) of Act 101, 55 P.S. § 600.204(e), which requires SEPTA to adopt a balanced budget. The court concluded that a fare increase cannot be based solely upon the objective of obtaining a balanced budget in anticipation of governmental subsidy shortfalls. Similarly, a transportation authority should not forego a necessary fare increase on the basis that government subsidies will rescue that authority with additional subsidies.
[25] We note that where complex questions of technology and finance are resolved by administrative decision, judicial review should be particularly restricted. Commonwealth v. Harmar Coal Co., 452 Pa. 77, 306 A.2d 308 (1973), appeal dismissed sub nom, Pittsburgh Coal Co. v. Pennsylvania, 415 U.S. 903, 94 S.Ct. 1395, 39 L.Ed.2d 460 (1974); Flaherty v. Port Authority of Allegheny County, 450 Pa. 509, 299 A.2d 613 (1973).
[26] In effect, Judge Lehrer made a determination of how much the federal, state and local taxpayers should pay toward the operation of SEPTA. The judiciary cannot grant SEPTA the power to tax, nor can it impose a tax itself. "A basic precept of our form of government is that the executive, the legislature and the judiciary are independent, co-equal branches of government. . . . [N]o branch should exercise the functions exclusively committed to another branch. (Citations omitted.)" Sweeney v. Tucker, 473 Pa. 493, 375 A.2d 698 (1977).
[27] Appellees have also filed an Application under Pa.R.A.P. 2155(b) to Allocate Cost of Unnecessary Reproduction. Our review of the record indicates that the reproduced record was reasonably necessary in this matter, and therefore we deny Appellees' Application.